ORIGINAL

1  Daniel S. Robinson, SBN 244245
2  Wesley K. Polischuk, SBN 254121
   ROBINSON CALCAGNIE, INC.
3  19 Corporate Plaza Dr.
   Newport Beach, CA 92660
4  Phone: (949) 720-1288
   Fax:   (949) 720-1292
5  drobinson@rcrsd.com
   wpolischuk@rcrsd.com
6
   Attorneys for Plaintiff Melquiades Bonilla
7  and the Proposed Class

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

MAY 31 2016

K. Garcia

8              SUPERIOR COURT FOR THE STATE OF CALIFORNIA
9                       COUNTY OF RIVERSIDE
10

11  MELQUIADES BONILLA, on behalf of          Case No.  RIC  1606640
    himself and all others similarly situated,
12                                            CLASS ACTION COMPLAINT FOR
13              Plaintiff,                     VIOLATION OF CONFIDENTIALITY
                                              OF MEDICAL INFORMATION ACT
14       v.                                   [CIVIL CODE § 56 ET SEQ.]

15  21ST CENTURY ONCOLOGY OF                  DEMAND FOR JURY TRIAL
    CALIFORNIA, a medical corporation; 21ST
16  CENTURY ONCOLOGY HOLDINGS, INC.;
17  and DOES 1 through 20,

18              Defendants.

19

20

21  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

22       All allegations made in this complaint are based upon information and belief, except

23  those allegations which pertain to plaintiff Melquiades Bonilla ("Plaintiff") and her counsel,

24  which are based on personal knowledge. Plaintiff's information and belief are based upon, *inter*

25  *alia,* Plaintiff's own investigation and the investigation conducted by Plaintiff's attorneys.

26  Plaintiff brings this action for injunctive relief, damages, and/or penalties against Defendants,

27  and hereby alleges as follows:

28  //

1
COMPLAINT

Exhibit A, Page 8

## INTRODUCTION

1.    Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy.*

2.    It is well-settled that the Constitutional zone of privacy extends to the details of a patient's medical information, and, *as a matter of law,* citizens of this State have a legally cognizable interest in maintaining the privacy of the detailed medical information conveyed to health care providers.

3.    In additional to the Constitutional protections of the privacy of citizens' medical information, the Legislature drafted – and the Governor has enacted – the Confidentiality of Medical Information Act ("CMIA"). The basic scheme of the CMIA is that a provider of health care *must not disclose or release medical information without a written authorization from the patient.*

4.    This putative class action arises from Defendants' admitted failure to maintain and secure the medical information of Plaintiff and all others similarly situated and Defendants' unauthorized disclosure and release of such highly confidential medical information to the public.

5.    In pursuing this action for public-wide injunctive relief and nominal damages, Plaintiff does not seek any relief greater than or different from the relief sought for the putative class of which Plaintiff is a member. The action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit, whether pecuniary or non-pecuniary, on a large class of persons. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stake in the matter.

## JURISDICTION

6.    This Court has subject matter jurisdiction over this action pursuant to California Civil Code § 56, *et seq.*

Exhibit A, Page 9

7.   This Court has personal jurisdiction over the parties because Defendants have continuously and systematically conducted business in the State of California. Likewise, Plaintiff's injuries occurred in the State of California and arose out of her contact with Defendants in California.

8.   Venue is proper in this Court pursuant to California Code of Civil Procedure sections 395 and 395.5 and case law interpreting those sections, which provide that if a business entity fails to designate with the office of the California Secretary of State a principal place of business in California, it is subject to being sued in any county that a plaintiff desires. On information and belief, 21st Century Oncology of California, a Medical Corporation, and 21st Century Oncology Holdings, Inc. have failed to designate a principal place of business in California with the office of the Secretary of State as of the date this Complaint was filed.

## PARTIES

### A.   Plaintiff

9.   Plaintiff Melquiades Bonilla is, and at all times mentioned in this Complaint was, an individual residing in California.

10.   Prior to the breach, Ms. Bonilla paid for and received medical treatment from a 21st Century Oncology Cancer Center located at 77-840 Flora Road, Palm Desert, CA 92211.

11.   Plaintiff had her confidential personal and medical information collected, stored, maintained, and/or generated by Defendants including, based on information and belief, her name, Social Security number, physician's name, diagnosis and treatment information, and insurance information.

12.   Plaintiff reasonably expected that the confidentiality of this personal and medical information would be secured and preserved by Defendants.

13.   Ms. Bonilla received a letter dated March 4, 2016 from 21st Century, informing her about the breach. The letter specifically informed Ms. Bonilla that on October 3, 2015, an unauthorized third party "may have accessed" a 21st Century database "which contained information that may have included your name, Social Security number, physician's name, diagnosis and treatment information, and insurance information."

3

COMPLAINT

Exhibit A, Page 10

14.    Prior to receiving notification by Defendant of the disclosure and release of her confidential medical information, Plaintiff was unaware that Defendants disclosed or released any medical information to anyone without her written authorization, or that her medical information was compromised in any way.

15.    At no time prior to or during the course of treatment or during the time of any medical services being provided to Plaintiff did Plaintiff consent, authorize, allow, or sanction, in writing or otherwise, Defendants to release her medical information, nor did the putative class members consent, authorize, allow, or sanction, in writing or otherwise, Defendants to release their medical information.

16.    The medical information of Plaintiff and all other putative Class Members is or was maintained, among other places, in a 21st Century Oncology network server which Defendants admitted is vulnerable to "break-ins" and "unauthorized tampering."[1]

**B.    Defendants**

17.    Defendant, 21st Century Oncology of California, A Medical Corporation, is a California corporation and is a provider of health care as defined in Civil Code section 56.05.

18.    Defendant, 21st Century Oncology Holdings, Inc., is a provider of health care as defined in Civil Code section 56.05.

19.    The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 20, inclusive, are currently unknown to Plaintiff, who therefore sues these Defendants by such fictitious names under Code of Civil Procedure section 474. Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated hereinafter as DOES when such identities become known.

20.    Each of the Defendants sued herein was the principal, agent, or employee of the other, and was acting within the scope of such agency or employment. Each Defendant sued herein was the co-conspirator of the other and was acting within the course and scope of a

---

[1] *See* 21st Century Oncology Holdings Inc., Amendment No. 3 to Form S-1, May 21, 2014, at p. 37; *available at* https://www.21co.com/investors/sec-filings.

Exhibit A, Page 11

1  conspiracy formed amongst each of them. Each Defendant sued herein aided and abetted the
2  other with the intent that each would be successful in their mutual endeavors. Each Defendant
3  sued herein, received money or property as a result of the conduct described herein without
4  consideration therefore and/or with knowledge that the money or property was obtained as a
5  result of the wrongful conduct described herein. Each entity Defendant sued herein is a shell
6  organization, and is actually the alter ego of the other Defendants sued herein.

7         21.    As used in this Complaint, the words "Defendant" or "Defendants" are used
8  interchangeably. These words mean and include each and every Defendant sued herein,
9  including DOES, and unless otherwise specified, "21st Century Oncology" means and refers to
10  Defendants 21st Century Oncology of California, a Medical Corporation, 21st Century
11  Oncology Holdings, Inc. and the fictitiously named Defendants.

## FACTUAL ALLEGATIONS

13         22.    Plaintiff refers to and incorporates by reference each and every paragraph above
14  as though set forth fully herein.

15         **A.    Background of 21st Century Oncology**

16         23.    21st Century Oncology and the Doe Defendants operate treatment centers under
17  the 21st Century Oncology name and under various other names in California, including
18  "Redding Cancer Treatment Center," "Solace Cancer Care," "Santa Cruz Radiation Oncology,"
19  "Cabrillo Radiation Oncology Center," "Coastal Radiation Oncology Center," "Mission Hope
20  Cancer Center," and "North Oaks Radiation Oncology Center,"

21         24.    Defendants routinely request, record, collect and/or generate protected personal
22  medical information about their patients, which includes, but is not limited to, patient names,
23  Social Security numbers, physician's names, diagnoses and treatment information, and
24  insurance information.

25         **B.    The Breach**

26         25.    On March 4, 2016, 21st Century issued a press release announcing a massive
27
28

5
COMPLAINT

1    data breach (hereinafter, "the Breach").[2]

2        26.    According to a form 8-K 21st Century filed with the Securities and Exchange

3    Commission, the FBI first advised 21st Century on November 13, 2015 that an unauthorized

4    third party illegally obtained patient information from one of its databases. According to 21st

5    Century's own investigation, the unauthorized party may have accessed the database as early as

6    October 3, 2015—nearly six months prior to 21st Century becoming aware of the unauthorized

7    access.[3]

8        27.    The database contained the PII of approximately 2.2 million current and former

9    21st Century Oncology patients, including the following:

10            i.   *names,*

11            ii.   *social security numbers,*

12            iii.   *treating physician's names,*

13            iv.   *diagnoses and treatment information, and*

14            v.   *insurance information.*[4]

15    According to 21st Century itself, the PII of these 2.2 million patients may have been copied and

16    transferred.[5]

17        28.    21st Century claims that the FBI asked it to delay announcement of the Breach

18    until March 4, 2016 "so as not to interfere with its investigations."[6]

19        29.    21st Century has also announced that it is notifying each of the 2.2 million

20    affected patients that their PII has been compromised, and will offer affected patients one-year

21    of free credit protection services and identity theft insurance. Defendants eventually attempted

22

23    [2] *See 21st Century Oncology Notifies Patients of Data Security Incident, Offers Protection,* PR
NEWSWIRE *available at* http://www.prnewswire.com/news-releases/21st-century-oncology-notifies-patients-of-
24    data-security-incident-offers-protection-300230892.html (last accessed March 16, 2016).
[3] *See* 21st Century Oncology Holdings Inc., Form 8-K, March 4, 2016, *available at*
25    http://www.sec.gov/Archives/edgar/data/1503518/000110465916102644/a16-5844_18k.htm.
[4] *See id.;* 21st Century Oncology Says Investigating Cyber Breach, *available at*
26    http://www.reuters.com/article/us-21stcenturyoncology-breach-idUSKCN0W629M.
[5] *See* Tom Spring, *21st Century Oncology Says Investigating Cyber Breach, supra* n.4.
27    [6] Based on 21st Century's representation that the FBI requested it to delay announcement of the Breach,
Plaintiff Bonilla and the Class Members not alleging that 21st Century unreasonably or improperly delayed
28    announcement of the Breach at this time. However, to the extent new information is revealed that indicates 21st
Century should have revealed the Breach sooner, Plaintiff and the Class Members reserve the right to amend the
Complaint.

6

COMPLAINT

1  to notify at least some their California patients about the break-in or compromise of patients'
2  confidential medical information as required under California state law when the notifying
3  party knows, or at the very least reasonably believes, that information relating to patients had
4  been accessed, acquired, or disclosed as a result of a breach.

5      30.     However, Defendants downplayed the break-in by claiming Defendants had no
6  indication whether patient information had been misused, yet at the same time Defendants
7  offered its patients credit monitoring services for a single year.

8      31.     On information and belief, the Breach occurred because 21st Century failed to
9  take reasonable measures to protect its patients' personally identifiable information from
10 unauthorized access.

11     32.     At least one Chief Technology Officer, James Chappel of Digital Shadows, has
12 already indicated that 21st Century did not take reasonable steps to safeguard its patients'
13 information, especially given the sensitive nature of a patients' cancer treatment: "The
14 circumstances in these patients' lives were already pretty tough … I'm surprised 21st Century
15 Oncology weren't better stewards of their patients' data given their circumstances."[7]

16 **C.    Effects of the Breach**

17     33.     As a result of 21st Century's failure to take reasonable measures to prevent the
18 Breach, unauthorized individuals now possess the PII of 21st Century's patients.

19     34.     There is an extensive cyber black market in which criminals openly exchange
20 stolen Social Security numbers, dates of birth, health information, and other types of personal
21 information on a number of websites.

22     35.     According to a 2013 report by Dell SecureWorks, individual social security
23 numbers can sell for $30, and date of births can sell for $11. However, the information is far
24 more valuable when combined with other personally identifiable information. An identity
25 package that includes a social security number, name and address—like the information

26

27

28

---

[7] *See Cancer Clinic Warns 2.2 Million Patients of Records Breach*, THREAT POST, March 8, 2016,
available at https://threatpost.com/cancer-clinic-warns-2-2-million-patients-of-records-breach/116668/

Exhibit A, Page 14

disclosed in the Breach—can sell for $250.[8]

36.    There is good reason why thieves value individuals' PII so highly. They can use it to commit a variety of fraud-related crimes that harm individuals. For instance, they can use an individual's identity to take out loans and open financial accounts and credit cards; fraudulently obtain government benefits; file fraudulent returns to obtain a tax refund; obtain a driver's license or identification card; gain employment; or give false information to police during an arrest.

37.    Likewise, healthcare information—like the type disclosed in the breach—is particularly valuable for cybercriminals. According to SecureWorks (a division of Dell Inc.), "[i]t's a well-known truism within much of the healthcare data security community that an individual healthcare record is worth more on the black market ($50, on average) than a U.S.-based credit card and personal identity with social security number combined." Likewise, an individual's healthcare insurance information—another type of information disclosed by 21st Century in the breach—can sell for $20. The reason is that thieves "can use a healthcare record to submit false medical claims (and thus obtain free medical care), purchase prescription medication, or resell the record on the black market."[9]

38.    As a result of 21st Century's failure to take reasonable measures to prevent the Breach, Plaintiff Bonilla and Class Members have suffered a significant loss in the value of their PII, as described above.

39.    Likewise, Plaintiff Bonilla and Class Members have been exposed to a heightened, imminent risk of fraud, identity theft, and financial harm.

40.    Plaintiff Bonilla and Class Members have had to more closely monitor, and/or in the future will have to more closely monitor their financial accounts to guard against identity theft, and have undertaken and/or will undertake other protective measures to deter or detect identity theft.

---

[8] Dell Secureworks, *Underground Hacker Markets*, Dec. 2014, *available at* https://www.secureworks.com/assets/pdf-store/white-papers/wp-underground-hacking-report.pdf
[9] *What's the Market Value of a Healthcare Record*, DELL SECUREWORKS, Dec. 13, 2012, *available at* https://www.secureworks.com/blog/general-market-value-of-a-healthcare-record

Exhibit A, Page 15

41.    In addition, Plaintiff Bonilla and Class Members have incurred and/or may have
to incur credit freezes. Credit reporting agencies impose fees for credit freezes in certain states.
Such fees constitute out-of-pocket costs.

42.    Plaintiff and Class Members have also incurred and/or may have to pay for
credit reports to detect unauthorized use of their PII. Credit reporting agencies offer consumers
one free credit report per year; however, individuals who request more than one credit report
per year must pay a fee for the additional report. Such fees constitute out-of-pocket expenses.

**D.    21st Century Knew that It's Policies and Infrastructure Were Inadequate
to Prevent the Breach**

43.    21st Century is not a stranger to data breaches—it has permitted unauthorized
individuals to access its patients' PII in the past.

44.    On or about May 15, 2013, federal law enforcement officials informed 21st
Century that it was indicting one of its employees for improperly accessing 21st Century's
patients' PII over the course of almost *ten months* between October 11, 2011 and August 8,
2012 (hereinafter, the "2011-12 Data Breach").[10]

45.    During the 2011-12 Data Breach, the 21st Century employee provided patients'
PII to a third party who used their names, Social Security numbers and dates of birth to file
fraudulent claims for tax refunds.[11]

46.    21st Century wholly failed to detect the 2011-12 Data Breach prior to the
notification from law enforcement. Moreover, when 21st Century notified the Maryland
Attorney General of the 2011-12 Data Breach in or about July 10, 2013, it still had not
determined how the employee was able to access this information.[12]

47.    As a result of the 2011-12 Data Breach, 21st Century knew that its policies and
infrastructure were inadequate to prevent unauthorized parties from accessing its patients' PII.
Moreover, 21st Century knew that it was and would in the future likely be a target of

---

[10] *See Ltr from Andrea L. Britt, Privacy and Security Officer, 21st Century Oncology, to Office of the
Attorney General, July 10, 2013, available at* https://www.oag.state.md.us/idtheft/Breach%20Notices/2013/itu-
230673.pdf.
[11] *See Id.*
[12] *See Id.*

9

COMPLAINT

1   unauthorized parties' attempt to obtain patients' PII to commit fraud related crimes.

2       48.    On information and belief, 21st Century did not implement adequate security

3   policies and infrastructure following the 2011-12 Data Breach to prevent future unauthorized

4   access to its patients' PII.

5       E.    **21st Century Has Repeatedly Put Profits Over Its Patients' Interests**

6       49.    This is also not the first time 21st Century has failed to maintain reasonable

7   policies and practices for the well-being of its patients. In fact, 21st Century has a long history

8   of taking unfair, illegal measures to increase its profits at the expense of its patients' interests,

9   including subjecting patients to unnecessary medical tests between 2009 and 2014 in order to

10  fraudulently obtain federal benefits. These practices were the subject of two separate

11  whistleblower cases brought under the False Claims Act that 21st Century recently agreed to

12  settle for $19.75 million and $34.5 million.

13      a.    **2013 False Claims Act Case**

14      50.    In or around March 2013, a medical assistant filed a whistleblower suit under

15  the False Claims Act against 21st Century alleging that 21st Century subjected its patients to

16  unnecessary cancer tests in order to fraudulently collect money from Medicare and other

17  federal health care programs.[13] The scheme lasted from 2008 through 2012.

18      51.    According to Special Agent in Charge Shimon Richmond of the Department of

19  Health and Human Services, "[t]hese tests were ordered to increase profits, not improve the

20  health care of patients."[14]

21      52.    In or around December 2015, 21st Century agreed to pay $19.75 million to

22  settle the claims.[15]

23

24

25      [13] *21st Century Oncology to pay $19.75M in Unnecessary Tests Medicare Lawsuit*, WHISTLEBLOWER

26  NEWS REVIEW, Dec. 18, 2015, *available at* http://www.whistleblowergov.org/healthcare-and-
    pharma.php?article=21st-century-oncology-to-pay-19.75m-in-unnecessary-tests-medicare-lawsuit_53

27      [14] *See 21st Century Oncology To Pay $19.75 Million To Settle Alleged False Claims For Unnecessary
    Laboratory Tests*, Dec. 18, 2015, UNITED STATES ATTORNEY'S OFFICE, MIDDLE DISTRICT OF FLORIDA, *available*

28  *at* https://www.justice.gov/usao-mdfl/pr/21st-century-oncology-pay-1975-million-settle-alleged-false-claims-
    unnecessary (last accessed March 28, 2016).
        [15] *See id.*

COMPLAINT

Exhibit A, Page 17

**b.    2015 False Claims Act Case**

53.    In or around October, 2012 another doctor filed a whistleblower suit under the False Claims Act against 21st Century alleging a separate scheme whereby 21st Century subjected patients to unnecessary lab tests in order to fraudulently collect money from federal health care programs.[16] The fraudulent scheme occurred between 2009 and 2014

54.    21st Century billed patients and the federal government for laboratory testing under a number of improper circumstances, including when (1) tests were performed by individuals who were not properly trained to interpret and utilize the results, (2) physicians did not review results until after patients had finished their treatment, and (3) no results were available due to technical failures in the laboratory equipment.[17]

55.    According to David L. Scher, counsel for the whistleblowing doctor, "[t]he company prioritized profit over medical counsel."[18]

56.    On or around March 9, 2016 (days after publicly disclosing the Breach at issue to the public and SEC), 21st Century agreed to settle the second whistleblower suit for $34.7 million.[19]

**F.    21st Century's Offers Do Not Adequately Compensate Plaintiffs and Class Members for the Breach**

57.    21st Century has offered Breach victims twelve months of credit monitoring and identity theft insurance (through Experian).[20] However, these offers are inadequate remedies because they do not compensate Plaintiff and Class Members for the harm they have suffered and are likely to suffer as a result of the Breach.

---

[16] See *United States Settles False Claims Act Allegations Against 21st Century Oncology For Nearly $34.7 Million*, March 8, 2016, UNITED STATES ATTORNEY'S OFFICE, MIDDLE DISTRICT OF FLORIDA, *available at* https://www.justice.gov/usao-mdfl/pr/united-states-settles-false-claims-act-allegations-against-21st-century-oncology-nearly (last accessed March 28, 2016).
[17] *See id.*
[18] *Medicare Fraud Whistleblower Represented By The Employment Law Group® Law Firm Wins $34.7 Million Settlement In Case Against 21st Century Oncology*, PR NEWSWIRE, March 8, 2016, *available at* http://www.prnewswire.com/news-releases/medicare-fraud-whistleblower-represented-by-the-employment-law-group-law-firm-wins-347-million-settlement-in-case-against-21st-century-oncology-300232646.html?src=ilaw (last accessed March 28, 2016).
[19] *See United States Settles False Claims Act Allegations Against 21st Century Oncology For Nearly $34.7 Million, supra*, n.19.
[20] *See* Ex. A, Breach Notification Letter to Plaintiff Bonilla.

11

COMPLAINT

58.     For one, neither service prevents unauthorized individuals from using individuals' PII to commit fraud related crimes. Credit monitoring only detects activity after identity thieves have used individuals' PII, such as after they have opened bank accounts or credit cards (and after Plaintiffs may have incurred losses).

59.     Likewise, identity theft insurance only compensates individuals for identity theft losses after they have occurred. And, even if identity theft insurance may *eventually* reimburse an individual for monetary losses suffered as a result of identity theft, it does not compensate he or she for the interim period between which the identity theft loss occurred and the reimbursement.

60.     Moreover, once and individual suffers an identity theft related crime, it is up to them to contact Experian to remove or reimburse any losses the individual has incurred.

61.     Accordingly, Plaintiff and Class Members will have to continuously monitor their accounts and credit reports, and take other steps so that they can promptly respond if and when their PII is used by unauthorized individuals.

62.     In fact, 21st Century itself recommends that victims of the Breach continuously take a number of steps to monitor their accounts, even after accepting the credit monitoring and identity theft insurance 21st Century has offered. In an attachment to the breach notification letter sent to Plaintiff Bonilla describing Experian's credit monitoring services, 21st Century recommends:

> Once your enrollment in ProtectMyID is complete, you should carefully review your credit report for inaccurate or suspicious items. If you ... suspect that an item on your credit report may be fraudulent, please contact Experian's customer care team ... .
>
> ....
>
> If you believe you are the victim of identity theft or have reason to believe your personal information has been misused, you should immediately contact the Federal Trade Commission and/or the Office of the Attorney General in your home state.[21]

63.     As a result of 21st Century's failure to take reasonable steps to prevent the

---

[21] *See id.*

1   Breach, Plaintiff Bonilla and Class Members have suffered and in the future will suffer actual
2   losses in the form of lost time and out-of-pocket expenses while actively taking steps to protect
3   themselves from identity theft and other fraud related crimes, including monitoring their
4   accounts and credit reports, and contacting Experian if and when they suffer unauthorized
5   charges and other losses as a result of the misuse of their PII.

6          64.    In addition, one year of credit monitoring and identity theft reimbursement does
7   not compensate Plaintiff Bonilla and Class Members for identity theft losses caused by the
8   Breach that will occur after one year. Even 21st Century acknowledges in the attachment to its
9   breach notification letter describing the credit monitoring offer that losses can occur well
10   beyond a year following a data breach: **"It is recognized that identity theft can happen**
11   **months and even years after a data breach."**

12          65.    Further, medical information—such as the type of information released in the
13   Breach—has added value to cyber thieves precisely because it does not have an expiration date
14   (as opposed to say, a credit card number). Accordingly, unauthorized individuals can use
15   medical information well after a year to commit fraud related crimes. According to Kunal
16   Rupani of Accelion (a security software company):

17           Unlike credit card numbers and other financial data, healthcare
18           information doesn't have an expiration date … As a result, a
19           patient's records can sell on the black market for upwards of fifty
        times the amount of their credit card number making hospitals and
        other healthcare organizations extremely lucrative targets for
20           cybercriminals.[22]

21          66.    In addition, 21st Century's offer of one-year of credit monitoring and identity
22   theft insurance does not compensate victims for the lost value of their PII resulting from the
23   unauthorized access and potential for unauthorized use of their information, as described above.

24                             **CLASS ACTION ALLEGATIONS**

25          67.    Plaintiff refers to and incorporates by reference each and every paragraph above

26

27   _____

28      [22] *See* Jeff Goldman, *21st Century Oncology Notifies 2.2 Million Patients of Data Breach,* eSecurity
Planet, March 11, 2016, *available at* http://www.esecurityplanet.com/network-security12 !st-century-oncology-
notifies-2.2-million-patients-ofdata-breach.lllml (last accessed Mar. 18, 2016).

1    as though set forth fully herein.

2        68.    Plaintiff brings this action on her own behalf and on behalf of all persons

3    similarly situated, as a class action pursuant to Code of Civil Procedure section 382.

4        69.    This lawsuit is brought on behalf of an ascertainable class, initially identified as:

5            **All patients of 21st Century Oncology and its network of
            treatment centers and physicians who are residents of the state
6            of California, and whose personally identifiable medical
            information was released to an unauthorized third party in the
7            data breach described in 21st Century Oncology's March 2016
            data breach notification.**

8

9

10       70.    Excluded from the class are Defendants, their corporate parents, subsidiaries and

11   affiliates, officers and directors, any entity in which Defendants have a controlling interest, and

12   the legal representatives, successors or assigns of any such excluded persons or entities.

13       71.    Plaintiff reserves the right under Rule 3.765 of the California Rules of Court to

14   amend or modify the class description with greater specificity or further division into

15   subclasses or limitation to particular issues.

16       72.    The members of the class are so numerous that joinder of all members is

17   impracticable. While the exact number of class members is unknown to Plaintiff at this time,

18   such information can be ascertained through appropriate discovery, and/or from records

19   maintained by Defendant and its agents.

20       73.    There is a well-defined community of interest among the members of the class

21   because common questions of law and fact exist as to all members of the class and predominate

22   over any questions affecting solely individual members of the class. Among the questions of

23   law and fact common to the class are:

24       A.    Whether the information disclosed by Defendants was "medical information" as

25            defined by Civil Code section 56.05(g);

26       B.    Whether Defendants failed to implement and maintain reasonable security

27            procedures and practices to preserve the confidentiality of Plaintiff's and Class

28            members' personal and medical information;

14
COMPLAINT

C.    Whether Defendants negligently created, maintained, preserved, or stored Plaintiff's and Class members' personal and medical information in violation of the CMIA;

D.    Whether Defendants negligently released Plaintiff's and Class members' personal and medical information to unauthorized persons in violation of the CMIA;

E.    Whether Plaintiff and Class members are entitled to statutory damages under the CMIA and other equitable relief.

74.    Plaintiff's claims are not only typical of the members of the class, but are identical to the claims of the class.

75.    Plaintiff can fairly and adequately represent the interests of the class, Plaintiff has no conflicts of interest with other class members, and Plaintiff has retained counsel competent and experienced in class action litigation, including class action litigation specifically pertaining to violations of California's Confidentiality in Medical Information Act.

76.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable, the likelihood of individual class members prosecuting separate claims is remote, and individual class members do not have a significant interest in individually controlling the prosecution of separate actions. Relief concerning Plaintiff's rights under the laws alleged herein and with respect to the class as a whole would be appropriate. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSE OF ACTION
## VIOLATION OF CIVIL CODE § 56 ET SEQ.
### [The Confidentiality in Medical Information Act]
### (As Against All Defendants)

77.    Plaintiff refers to and incorporates by reference each and every paragraph above as though set forth fully herein.

15
COMPLAINT

78.    Pursuant to the Confidentiality of Medical Information Act ("CMIA"), health care providers have an affirmative duty to preserve the confidentiality of patient information, as set forth in Civil Code section 56.101:

> (a) Every provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36. (b) (1) An electronic health record system or electronic medical record system shall do the following: (A) Protect and preserve the integrity of electronic medical information. (B) Automatically record and preserve any change or deletion of any electronically stored medical information. The record of any change or deletion shall include the identity of the person who accessed and changed the medical information, the date and time the medical information was accessed, and the change that was made to the medical information.

79.    Defendants are providers of health care (or in the alternative, contractors) who create, maintain, preserve, store, abandon, destroy, or dispose of medical information for purposes of the CMIA.

80.    Pursuant to Civil Code section 56.10, subdivision (a), "No provider of health care shall disclose medical information regarding a patient of the provider without first obtaining an authorization, except as provided in subdivision (b) or (c)."

81.    The "authorization" requirements set forth in Civil Code section 56.11 are detailed and demanding, reflecting the Legislature's interest in assuring that medical information may be disclosed only for a narrowly defined purpose, to an identified party, for a limited period of time.

82.    For an authorization to be valid it must be handwritten or typed, in language clearly separate from any other language on the same page, and properly signed and dated by the patient or one of the permissible substitutes enumerated under the Act. The signature must

16

COMPLAINT

serve no other purpose than to execute the authorization. (Civ. Code § 56.11 subds. (a), (b) & (c).) The authorization must state "the specific uses and limitations on the types of medical information to be disclosed[,][¶] ... the name or functions of the provider of health care that may disclose the information[,][¶] ... the name or functions of the persons or entities authorized to receive the medical information[,][¶] ... the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information[,][¶] ... a specific date after which the provider of health care is no longer authorized to disclose the medical information[,]" and that the person signing the authorization has been advised of the right to receive a copy of the authorization. (Civ. Code, § 56.11, subds. (d)–(i).)

83.    Plaintiff did not provide a valid authorization to Defendants allowing the disclosure of her medical information to anyone other than personnel employed by Defendants.

84.    Under normal circumstances, where there is no valid authorization, a healthcare provider may not disclose an individual's medical information. (Civ. Code, § 56.10, subd. (a).)

85.    Defendants violated the CMIA by failing to use reasonable care to preserve the confidentiality of Plaintiffs' and Class Members' medical information, and, in fact, negligently maintaining, preserving, storing, abandoning, and disposing of Plaintiffs' and Class Members' medical information.

86.    Civil Code section 56.36(b) provides

(b) In addition to any other remedies available at law, an individual may bring an action against a person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following:
(1) Except as provided in subdivision (c), nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it is not necessary that the plaintiff suffered or was threatened with actual damages.
(2) The amount of actual damages, if any, sustained by the patient.

87.    As a direct and proximate result of Defendants' failure to maintain, preserve, or store, medical information of its patients, including Plaintiff, in a reasonable manner to

17
COMPLAINT

preserve the confidentiality of the information contained therein, and the unauthorized disclosure and negligent release of Plaintiff and the putative class members' confidential medical information through a break-in or compromise of Defendants' network, Defendants breached their duties under the CMIA, and Plaintiff and Class Members have suffered injury. This includes, but is not limited to, exposure to a heightened, imminent risk of fraud, identity theft, and financial harm; the necessity to more closely monitor financial accounts to guard against identity theft; and incurred and future out-of-pocket costs for obtaining credit reports, credit freezes, and other protective measures to deter or detect identity theft. In addition, the unauthorized acquisition of Plaintiffs and Class Members' PII, which can be used to conduct a variety of fraud related crimes, has diminished the value of said information.

88.    Accordingly, as a result of Defendants' violations of the CMIA, Plaintiff and each of the class members are entitled to actual damages for their injuries *and* statutory damages of $1,000.

89.    In addition, as a direct and proximate result of Defendants' unauthorized disclosure of Plaintiff and the putative class members' confidential information over the internet, Plaintiff and each putative class member are entitled to equitable relief, including injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands on behalf of herself and all others similarly situated, judgment against Defendants for the following:

1.    That the Court determines that this action may be maintained as a class action and appointing Plaintiff as a representative of the class, and appointing Plaintiff's counsel as counsel for the class;

2.    Actual damages and statutory nominal damages in the amount of $1,000 per person/per violation;

3.    For a public-wide injunction requiring Defendants to comply with Civil Code section 56 *et seq.*, by, among other measures, requiring Defendants to immediately secure and fully encrypt all confidential information, to store any computer passwords in a location

18

COMPLAINT

1  separate from the computers, to conduct an audit to determine weaknesses in their medical

2  information security, to improve their policies, procedures, and infrastructure used to determine

3  threats to the security of individuals' medical information and monitor and prevent

4  unauthorized attempts to gain access to patients' medical information, to cease negligently

5  storing, handling, and securing its patients' confidential information, and to notify patients

6  whose medical information is wrongly disclosed in an expedient and timely manner;

7        4.      For a public-wide injunction requiring Defendants to pay for identity theft and

8  credit monitoring for a minimum of five (5) years for each putative class member;

9        5.      For a public-wide injunction requiring Defendants to pay for internet reputation

10  monitoring for a minimum of five (5) years for each putative class member;

11       6.      An order requiring Defendants to pay all costs associated with Class notice and

12  administration of Class-wide relief;

13       7.      An order Requiring Defendants to pay pre-judgment and post-judgment interest,

14  as provided by law or equity;

15       8.      For attorneys' fees and costs of suit as authorized by statute including, but not

16  limited to, the provisions of California Civil Code section 56.35 and/or California Code of

17  Civil Procedure section 1021.5, and as authorized under the "common fund" doctrine and/or as

18  authorized by the substantial benefit doctrine; and

19       9.      Any other and further relief the Court may deem proper.

20

21  Date: May 31, 2016                          ROBINSON CALCAGNIE, INC.

22

23                                  By:  _____
                                         Wesley K. Polischuk

24
                                         *Attorney for Plaintiff Melquiades Bonilla
25                                       and the Proposed Class*

26

27

28

## JURY DEMAND

Plaintiff, individually and on behalf of all others similarly situated, hereby demands a trial by jury on all issues so triable.

Date: May 31, 2016                    ROBINSON CALCAGNIE, INC.

                        By:   _____
                              Wesley K. Polischuk

                              *Attorney for Plaintiff Melquiades Bonilla*
                              *and the Proposed Class*

20

COMPLAINT

# EXHIBIT A


21st Century Oncology

Return Mail Processing Center
PO Box 6336
Portland, OR 97228-6336

||||||||||||||||||||||||||||    877420199714

||||||||||||||||||||||||||||||||||||||||||||||
000 0116240 00000000 001 002 28813 001 0.0
MELQUISADEZ BONILLA
PO BOX 680
INDIO, CA 92202-0680                97
                                  28813                                    March 4, 2016

Dear Melquisadez Bonilla:

21st Century Oncology is committed to maintaining the privacy and security of our patients' personal information. Regrettably, we are writing to inform you of an incident involving some of that information.

On November 13, 2015, the Federal Bureau of Investigation (FBI) advised us that patient information was illegally obtained by an unauthorized third party who may have gained access to a 21st Century database. We immediately hired a leading forensics firm to support our investigation, assess our systems and bolster security. The forensics firm determined that, on October 3, 2015, the intruder may have accessed the database, which contained information that may have included your name, Social Security number, physician's name, diagnosis and treatment information, and insurance information. We have no evidence that your medical record was accessed.

The FBI asked that we delay notification or public announcement of the incident until now so as not to interfere with its investigation. Now that law enforcement's request for delay has ended, we are notifying patients as quickly as possible. We continue to work closely with the FBI on its investigation of the intrusion into our system. In addition to security measures already in place, we have also taken steps to enhance internal security protocols to help prevent a similar incident in the future.

We have no indication that your information has been misused in any way; however, out of an abundance of caution, we are offering you a free one-year membership of Experian's® ProtectMyID® Alert. This product helps detect possible misuse of your personal information and provides you with identity protection services focused on immediate identification and resolution of identity theft. ProtectMyID Alert is completely free to you, and enrolling in this program will not hurt your credit score. For more information on identity theft prevention and ProtectMyID Alert, including instructions on how to activate your complimentary one-year membership, please see the additional information provided in this letter. We also recommend that you regularly review the explanation of benefits that you receive from your health insurer. If you see services that you did not receive, please contact your insurer immediately.

We deeply regret any concern this may cause you, and we want to emphasize that your care will not be affected by this incident. Should you have any questions, please call 1-866-446-1405, from 9 a.m. to 9 p.m. Eastern Time, Monday through Friday.

Sincerely,

Daniel Dosoretz, M.D.
President and CEO

Attachment

O4561 v.08 03.01.2016.

### Activate ProtectMyID Now in Three Easy Steps

1. ENSURE That You Enroll By: July 7, 2016 (Your code will not work after this date.)
2. VISIT the ProtectMyID Website to enroll: www.protectmyid.com/redeem
3. PROVIDE Your Activation Code: PA92GKDLM

If you have questions or need an alternative to enrolling online, please call (866) 271-3084 and provide engagement #: PC98965

### ADDITIONAL DETAILS REGARDING YOUR 12-MONTH PROTECTMYID MEMBERSHIP:

A credit card is not required for enrollment.

Once your ProtectMyID membership is activated, you will receive the following features:

- Free copy of your Experian credit report
- Surveillance Alerts for:
  - Daily Bureau Credit Monitoring: Alerts of key changes and suspicious activity found on your Experian, Equifax®, and TransUnion® credit reports.
- Identity Theft Resolution and ProtectMyID ExtendCARE: Toll-free access to U.S.-based customer care and a dedicated Identify Theft Resolution agent who will walk you through the process of fraud resolution from start to finish for seamless service. They will investigate each incident; help with contacting credit grantors to dispute charges and close accounts, including credit, debit, and medical insurance cards; assist with freezing credit files; and contact government agencies.
  - It is recognized that identity theft can happen months and even years after a data breach. To offer added protection, you will receive ExtendCARE™, which provides you with the same high level of Fraud Resolution support even after your ProtectMyID membership has expired.
- $1 Million Identity Theft Insurance*: Immediately covers certain costs, including lost wages, private investigator fees, and unauthorized electronic fund transfers.

Activate your membership today at www.protectmyid.com/redeem.
or call (866) 271-3084 to register with the activation code above.

Once your enrollment in ProtectMyID is complete, you should carefully review your credit report for inaccurate or suspicious items. If you have any questions about ProtectMyID, need help understanding something on your credit report, or suspect that an item on your credit report may be fraudulent, please contact Experian's customer care team at (866) 271-3084.

Even if you choose not to take advantage of this free credit monitoring service, we recommend that you remain vigilant to the possibility of fraud and identity theft by reviewing your credit card, bank, and other financial statements for any unauthorized activity. You may also obtain a copy of your credit report, free of charge, directly from each of the three nationwide credit reporting agencies. To order your credit report, free of charge, once every twelve months, please visit www.annualcreditreport.com or call toll-free at 1-877-322-8228. Contact information for the three nationwide credit reporting agencies is as follows:

| Equifax | Experian | TransUnion |
|---|---|---|
| PO Box 740241 | PO Box 2002 | PO Box 1000 |
| Atlanta, GA 30374 | Allen, TX 75013 | Chester, PA 19022 |
| www.equifax.com | www.experian.com | www.transunion.com |
| 1-800-685-1111 | 1-888-397-3742 | 1-800-916-8800 |

If you believe you are the victim of identity theft or have reason to believe your personal information has been misused, you should immediately contact the Federal Trade Commission and/or the Office of the Attorney General in your home state. Contact information for the Federal Trade Commission is as follows:

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
www.ftc.gov/idtheft
1-877-438-4338

O4582 v.06 03.01.2016

#:31

You can obtain information from these sources about steps an individual can take to avoid identity theft as well as information about fraud alerts and security freezes. You should also contact your local law enforcement authorities and file a police report. Obtain a copy of the police report in case you are asked to provide copies to creditors to correct your records.

* Identity theft insurance is underwritten by insurance company subsidiaries or affiliates of AIG. The description herein is a summary, intended for informational purposes only, and does not include all terms, conditions, and exclusions of the policies described. Please refer to the actual policies for terms, conditions, and exclusions of coverage. Coverage may not be available in all jurisdictions.

O4583 v.06 03/01/2016

CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Daniel S. Robinson (CA Bar No. 244245)
Wesley K. Polischuk (CA Bar No. 254121)
Robinson Calcagnie, Inc.
19 Corporate Plaza Drive
Newport Beach, CA 92660
TELEPHONE NO.: (949) 720-1288    FAX NO.: (949) 720-1292
ATTORNEY FOR *(Name):* Plaintiff MELQUIADES BONILLA

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
STREET ADDRESS: 4050 Main Street
MAILING ADDRESS: (Same as Above)
CITY AND ZIP CODE: Riverside, CA 92501
BRANCH NAME:

CASE NAME: MELQUIADES BONILLA vs. 21ST CENTURY ONCOLOGY OF CALIFORNIA, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: RIC 1606640 |
|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

**1.** Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[X] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

**2.** This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [X] Large number of separately represented parties
b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [X] Substantial amount of documentary evidence
d. [X] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply):* a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [ ] punitive
**4.** Number of causes of action *(specify):* 1
**5.** This case [X] is [ ] is not a class action suit.
**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: May 31, 2016
Wesley K. Polischuk
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.
Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]
CIVIL CASE COVER SHEET
Legal Solutions Plus
Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

**Exhibit A, Page 32**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case-management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
　Asbestos Property Damage
　Asbestos Personal Injury/ Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
　Medical Malpractice— Physicians & Surgeons
　Other Professional Health Care Malpractice
Other PI/PD/WD (23)
　Premises Liability (e.g., slip and fall)
　Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
　Intentional Infliction of Emotional Distress
　Negligent Infliction of Emotional Distress
　Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
　Legal Malpractice
　Other Professional Malpractice (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
　Breach of Rental/Lease Contract (*not unlawful detainer or wrongful eviction*)
　Contract/Warranty Breach—Seller Plaintiff (*not fraud or negligence*)
　Negligent Breach of Contract/ Warranty
　Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
　Collection Case—Seller Plaintiff
　Other Promissory Note/Collections Case
Insurance Coverage (*not provisionally complex*) (18)
　Auto Subrogation
　Other Coverage
Other Contract (37)
　Contractual Fraud
　Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
　Writ of Possession of Real Property
　Mortgage Foreclosure
　Quiet Title
　Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
　Writ—Administrative Mandamus
　Writ—Mandamus on Limited Court Case Matter
　Writ—Other Limited Court Case Review
Other Judicial Review (39)
　Review of Health Officer Order
　Notice of Appeal—Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims (*arising from provisionally complex case type listed above*) (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
　Abstract of Judgment (Out of County)
　Confession of Judgment (*non-domestic relations*)
　Sister State Judgment
　Administrative Agency Award (*not unpaid taxes*)
　Petition/Certification of Entry of Judgment on Unpaid Taxes
　Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
　Declaratory Relief Only
　Injunctive Relief Only (*non-harassment*)
　Mechanics Lien
　Other Commercial Complaint Case (*non-tort/non-complex*)
　Other Civil Complaint (*non-tort/non-complex*)
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition (*not specified above*) (43)
　Civil Harassment
　Workplace Violence
　Elder/Dependent Adult Abuse
　Election Contest
　Petition for Name Change
　Petition for Relief from Late Claim
　Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

**Exhibit A, Page 33**

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
4050 Main Street
Riverside, CA  92501
www.riverside.courts.ca.gov

### NOTICE OF ASSIGNMENT TO DEPARTMENT
### AND CASE MANAGEMENT CONFERENCE (CRC 3.722)

BONILLA VS 21ST CENTURY (

CASE NO. RIC1606640

This case is assigned to the Honorable Judge Craig G. Riemer in Department 05  for all purposes.

The Case Management Conference is scheduled for 08/03/16 at  8:30 in Department 05.

Department 5 and 10 are located at 4050 Main St, Riverside, CA 92501.

The  plaintiff/cross-complainant  shall  serve  a  copy  of  this  notice  on  all  defendants/cross-defendants  who are named or added to the complaint and file proof of service.

Any disqualification pursuant to CCP section 170.6 shall be filed  in accordance with that section.

Requests  for  accommodations  can  be  made  by  submitting  Judicial  Council  form  MC-410  no  fewer  than five court days before the hearing. See California Rules of Court, rule 1.100.

### CERTIFICATE OF MAILING

I  certify  that  I  am  currently  employed  by  the  Superior  Court  of  California,  County  of  Riverside,  and  that  I am  not  a  party  to  this  action  or  proceeding.    In  my  capacity,  I  am  familiar  with  the  practices  and procedures  used  in  connection  with  the  mailing  of  correspondence.    Such  correspondence  is  deposited in  the  outgoing  mail  of  the  Superior  Court.    Outgoing  mail  is  delivered  to  and  mailed  by  the  United  States Postal  Service,  postage  prepaid,  the  same  day  in  the  ordinary  course  of  business.    I  certify  that  I  served a copy of the foregoing NOTICE on this date, by depositing said copy as stated above.

Court Executive Officer/Clerk

by: _____

Date: 05/31/16

KIM M GARCIA, Deputy Clerk

ccadcc
12/11/14

**Exhibit A, Page 34**

**Mailing List**

Notice 'CCADCC' has been printed for the following Attorneys/Firms
or Parties for Case Number RIC1606640 on  5/31/16:


   MELQUIADES  BONILLA

**SUMMONS**
**(CITACION JUDICIAL)**

SUM-100

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
21ST CENTURY ONCOLOGY OF CALIFORNIA, a medical corporation;
21ST CENTURY ONCOLOGY HOLDINGS, INC.; and DOES 1 through 20

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

MAY 31 2016

K. Garcia

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MELQUIADES BONILLA, on behalf of himself and all others similarly
situated

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, County of Riverside
4050 Main Street
Riverside, CA 92501

CASE NUMBER:
*(Número del Caso):*
RIC  1606640

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Daniel S. Robinson; Wesley K. Polischuk    (949) 720-1288    (949) 720-1292
Robinson Calcagnie, Inc.
19 Corporate Plaza Drive
Newport Beach, CA 92660
DATE:           MAY 31 2016                    Clerk, by _Kim Goer_, Deputy
*(Fecha)*                                      *(Secretario)*              *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal
Solutions
® Plus

Code of Civil Procedure §§ 412.20, 465

Page 1 of 1

RI-CI032

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

☐ BANNING 311 E. Ramsey St., Banning, CA 92220
☐ BLYTHE 265 N. Broadway, Blythe, CA 92225
☐ HEMET 880 N. State St., Hemet, CA 92543
☐ MORENO VALLEY 13800 Heacock St., Ste. D201, Moreno Valley, CA 92553

☐ MURRIETA 30755-D Auld Rd., Suite 1226, Murrieta, CA 92563
☐ PALM SPRINGS 3255 E. Tahquitz Canyon Way, Palm Springs, CA 92262
☒ RIVERSIDE 4050 Main St., Riverside, CA 92501

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar Number, and Address):
Daniel S. Robinson (CA Bar No. 244245)
Wesley K. Pollachuk (CA Bar No. 254121)
Robinson Calcagnie, Inc.
19 Corporate Plaza Drive, Newport Beach, CA 92660
TELEPHONE No. (949) 720-1288    FAX NO. (Optional): (949) 720-1292
E-MAIL ADDRESS (Optional): drobinson@rcrsd.com
ATTORNEY FOR (Name): Plaintiff MELQUIADES BONILLA

FOR COURT USE ONLY

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE
MAY 31 2016
K. Garcia

PLAINTIFF/PETITIONER: MELQUIADES BONILLA

DEFENDANT/RESPONDENT: 21ST CENTURY ONCOLOGY OF CALIFORNIA, et al

CASE NUMBER: RIC 1606640

### CERTIFICATE OF COUNSEL

The undersigned certifies that this matter should be tried or heard in the court identified above for the reasons specified below:

☒ The action arose in the zip code of: 92211

☐ The action concerns real property located in the zip code of: _____

☐ The Defendant resides in the zip code of: _____

For more information on where actions should be filed in the Riverside County Superior Courts, please refer to Local Rule 1.0015 at www.riverside.courts.ca.gov.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date May 31, 2016

Wesley K. Pollachuk
(TYPE OR PRINT NAME OF ☒ ATTORNEY ☐ PARTY MAKING DECLARATION)    (SIGNATURE)

Approved for Mandatory Use
Riverside Superior Court
RI-CI032 (Rev. 08/14/15)

CERTIFICATE OF COUNSEL

Page 1 of 1
Local Rule 1.0015
riverside.courts.ca.gov/localfrms/localfrms.shtml

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF RIVERSIDE

| | | |
|---|---|---|
| CASE TITLE: Bonilla v. 21st Century Oncology of California | Department 5 | **FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF RIVERSIDE<br><br>JUN 01 2016 |
| CASE NO.:   RIC1606640 | | S. Salazar |
| DATE:      May 31, 2016 | | |
| PROCEEDING:  Class Action Case Management Order | | |

Unless and until ordered otherwise, this Case Management Order (CMO) shall govern the management of this case.

**A.  CASE MANAGEMENT**

1.  The Court finds that this is a complex case.  (Cal. Rules of Court, rules 3.400(c)(6) and 3.403(b).)  The clerk shall impose fees accordingly. The court will entertain objections to this designation at the next Case Management Conference or status conference.

2.  This case has been assigned to Department 5 for all purposes, including case management, law and motion, and trial.

3.  The plaintiff shall serve a copy of this CMO on any defendants who have not yet appeared, and shall file proof of service promptly thereafter.

4.  Any party who has appeared in the action at the time this CMO is entered has 15 days from the service of the CMO in which to object to the CMO.  Any party appearing after the entry of the CMO shall have 15 days from that initial appearance in which to object to the CMO.  Any such objections shall be in writing and shall be presented to the Court in the form of a noticed motion to amend the CMO. Any party that fails to file such a motion within those 15 days forfeits its objections to the CMO.

5.  If the Court issues an order to show cause why the Court should not take some specified action:

    a.  The party to whom the OSC is directed shall respond with a written declaration filed five days before the hearing on the OSC.  (Cal. Rules of Court, rule 3.110(i); RSC Local Rule 3116.) The Court may deem the failure to file a timely declaration, by itself, to constitute an admission by the responding party that good cause to avoid the threatened sanction or other action does not exist. (RSC Local Rule 3116.)

    b.  If the order to show cause threatens the imposition of monetary or other sanctions for the violation of a court order or rule, then counsel for the party to whom the OSC is directed must not only file a timely declaration, but must also personally appear in court at the date set for the return of the OSC.  (Cal. Rules of Court, rule 3.670(e)(2)(A).)

1

6.     Not later than five court days in advance of the first Case Management Conference after all parties have appeared, the parties shall file the joint statement required by RSC Local Rule 3160 instead of Judicial Council form CM-110 [case management statement].

7.     Not later than five court days before any subsequent Case Management Conference or status conference, the parties shall file a joint statement that:

      a.     Describes the status of the case, including the parties' discovery plan, the degree to which that plan has been implemented, and mediation efforts; and

      b.     Identifies any issues or concerns that either party wishes to discuss with the Court.

8.     Because the Court intends to conduct portions of the Case Management Conference and status conferences informally, in chambers, the lead counsel shall personally appear. Appearance via Court Call is not permitted.


B.     **SERVICE AND RESPONSIVE PLEADINGS**

1.     All defendants named at the time of the filing of this CMO shall be served, and proofs of service filed, prior to the case management conference.

2.     Any defendant named after the filing of this CMO shall be served, and proof of service shall be filed, within 60 days of the filing of the pleading, amendment, or amended pleading naming that defendant. (Modifying Cal. Rules of Court, rule 3.110(b).)

3.     The power of the plaintiff to grant extensions of time in which to file responsive pleadings is subject to the limits in California Rules of Court, rule 3.110(d), except that the maximum extension by counsel is extended to 30 days.

4.     If a defendant fails to file an answer or any other responsive pleading within 30 days of service, or within any extension granted by the plaintiff or the Court, the plaintiff must request entry of default not later than 30 days after the time for service of the responsive pleading has elapsed. (Modifying Cal. Rules of Court, rule 3.110(g).)

5.     The plaintiff shall serve a copy of this CMO simultaneously with any summons and complaint served after the date of entry of this order.

6.     The Court should not be asked to evaluate the sufficiency of a pleading until the pleader has stated his or her case or defense as strongly as possible. Therefore, if a party is considering either an amendment of a pleading or a challenge to an opponent's pleading:

      a.     The parties shall strictly comply with Code of Civil Procedure section 430.41, which requires that parties meet and confer before any demurrer is filed. Similarly, before filing any other challenge to an opponent's pleading, such as a motion to strike or a motion for judgment on the pleadings, the parties shall meet and confer to determine whether the challenge is arguably meritorious and, if so, whether the parties will stipulate to leave to amend being granted to allow the pleading to be amended in an attempt to cure the asserted defect.

b.  Any party who believes that his or her pleading needs to be amended shall meet and confer with the opposing party to discuss whether the amendment is arguably necessary and whether the opposing party will stipulate to the filing of the amended pleading. Consent to such an amendment shall not be unreasonably withheld.

c.  By "meet and confer," the Court means that counsel for the parties shall meet with each other, either by telephone or in person, to discuss any arguable defects in the pleadings, and whether those potential defects can be resolved or diminished by amendment. Merely sending a letter or email to opposing counsel does not constitute a meeting, and thus does not comply with this order. Counsel for the moving or demurring party must follow up on any such written communication with an oral request either by telephone or in person.

d.  Any challenge to a pleading, and any motion for leave to amend a pleading, must be accompanied by a declaration describing those meet-and-confer efforts and establishing that such a stipulation to amend was sought without success.

e.  In the absence of evidence of such an effort to meet and confer, the Court may overrule the demurrer, deny the motion, or continue the hearing until such an effort has been made.

## C.  REQUESTS FOR DISMISSAL OF CLASS CLAIMS

If the plaintiff seeks to dismiss the entire action, any defendant in the action, or the class allegations in the action:

1.  Because any such dismissal requires court approval, the request shall be made by the submission to the court of both (a) a declaration from plaintiff's counsel and from each named plaintiff and (b) a proposed order of dismissal. Counsel shall not use the preprinted Request for Dismissal, Judicial Council form CIV-110.

2.  The declarations must comply with California Rules of Court, rule 3.770(a), pertaining to any consideration being paid for the dismissal. Because the purpose of the requirement is to avoid collusion between the parties to the detriment of the potential class members, the showing must be made by declaration rather than by stipulation.

3.  Because the Court must also decide whether notice should be given to actual or potential class members (Cal. Rules of Court, rule 3.770(c)), the declarations shall also state (a) whether either the plaintiff or plaintiff's counsel has ever informed any of the potential class members – whether formally or informally, orally or in writing, individually or as a group – of the preparation, filing, or pendency of the action, and (b) if so, the nature and extent of that information.

4.  Any request shall explain why the putative class members will not be prejudiced by the requested dismissal.

3

5. If the dismissal is in exchange for any consideration, the application shall explain each of the following:

   a. What is the form and value of the consideration, and to whom is it to be paid?

   b. If the consideration is in the form of one or more monetary payments, how were the payments calculated?

   c. How is the retention of that consideration either by the plaintiff or the plaintiff's attorney consistent with their respective fiduciary duties to the class?

   d. If the plaintiff is to give a release in addition to a dismissal, what is the scope of that release?

D. **DISCOVERY**

1. Counsel are encouraged to engage in informal discovery rather than relying on formal discovery.

2. All formal discovery concerning solely the merits of the plaintiff's claims (as opposed to whether a class should be certified to prosecute those claims) is stayed until a motion regarding class certification has been filed and decided.

3. Unless the parties agree otherwise, all formal discovery concerning class-certification issues is stayed pending further order of the court.

4. Requests for leave to propound formal discovery concerning class-certification issues may be made at status conferences or informal conferences with the Court, in accordance with paragraph 5 below. However, before the Court will permit a party to propound any such formal discovery, that party must demonstrate:

   a. That the parties met and conferred to discuss both (i) the scope and sources of the information needed to support or oppose a class-certification motion and (ii) whether the parties would agree to exchange that information informally;

   b. That the parties were unable to reach an agreement; and

   c. The discovery is reasonably necessary either (i) to permit a meaningful mediation or (ii) to make or oppose a certification motion.

5. No discovery motions may be filed without leave of court. If a discovery dispute arises, the parties shall meet and confer either in person or by telephone in a good-faith effort to resolve the dispute. If, despite that effort, the parties are unable to resolve the dispute, then counsel shall contact the clerk of this department to schedule an informal conference at which the court will discuss the dispute with counsel and, if not resolved to the parties' satisfaction, will consider any request for leave to file a formal motion. The conference may be conducted by telephone or in person, as counsel prefer. If the opposing side will not agree to participate in the informal conference, then the moving party shall bring an ex parte application for leave to file a discovery motion.

4

E.    MEDIATION AND CLASS CERTIFICATION

1.    The court expects the parties to engage in private mediation at the earliest practicable time, i.e., as soon as all parties have obtained, through informal means, sufficient information from the opposing party(s) to enable them to engage in meaningful mediation.

2.    No motion for class certification or to deny class certification shall be filed without leave of court. Before leave to file such a motion is requested, the Court expects the parties to have exhausted efforts to mediate a resolution of the case.

F.    MOTIONS & APPLICATIONS GENERALLY

1.    A party making an ex parte application must, inter alia, "[a]ttempt to determine whether the opposing party will appear to oppose the application." (Cal. Rules of Court, rule 3.1204(a)(2).) That attempt shall be made by telephone. Written notice asking the opposing party to inform the moving party of the opposing party's intentions is not sufficient.

2.    A party desiring an order shortening time for notice of a motion shall not bring an ex parte application for such an order until that party has first (a) reserved the earliest available hearing date for the motion and (b) filed the motion. The Court will not deem the ex parte application as constituting the motion to be heard.

3.    Any request for relief from a forfeiture of the right to a jury trial must be brought in the form of a noticed motion to be heard not later than the Trial Readiness Conference, or if no TRC is set, then not later than 21 days before the date first set for trial.

4.    Any party who obtains an order as a result of any motion, application, stipulation or recommendation filed by that party shall promptly (a) serve a copy of that order on all parties and (b) file a proof of that service with the Court.

5.    Any motion or application for relief shall describe any prior motion or application in this case for the same or similar relief, including the name of the party who brought the prior motion or application, the date of the ruling on that motion or application, and the nature of that ruling.

G.    MOTIONS FOR PRELIMINARY APPROVAL OF SETTLEMENT

If the matter is settled and a motion for preliminary approval of the settlement is filed:

In General

1.    The motion shall be supported by a declaration from the plaintiff's attorney that, inter alia:

    a.    Sets forth the attorney's estimate of the number of individuals in the class.

b. Sets forth the attorney's estimate of the total amount of damages, monetary penalties or other relief that the class would be awarded if the action were successful at trial on all of its claims.

c. Sets forth the attorney's estimate of the total amount of damages, monetary penalties or other relief that the class could reasonably expect to be awarded at trial, taking into account the likelihood of prevailing and other attendant risks.

d. Sets forth the attorney's estimate of the recovery by the average class member if the settlement were approved. If the recovery by different class members will vary, the attorney shall also estimate the range (high and low) of possible recoveries.

e. States (i) whether the attorney is aware of any class, representative or other collective action in any other court in this or any other jurisdiction that asserts claims similar to those asserted in this action on behalf of a class or group of individuals who would also be members of the class defined in this action and, if so, (ii) the name and case number of any such case, the nature of the claims asserted, the definition of the class or other parties on whose behalf the action is brought, and the procedural status of that case. Before making that declaration, the attorney shall make reasonable inquiry of other members of the attorney's law firm and any associated law firm to determine whether those individuals are aware of any such similar actions.

2. If the settlement provides that any unclaimed or otherwise unpaid residue of the settlement proceeds are to be distributed to a proposed *cy pres* recipient:

a. The motion shall explain why a *cy pres* recipient is reasonably necessary.

b. The motion shall describe any relationship between the proposed *cy pres* recipient and (i) any class representative or other party, (ii) any officer, director, or manager of any party, or (iii) any attorney or lawfirm for any party.

c. The motion shall be supported by a declaration from a knowledgeable person from the proposed *cy pres* recipient establishing that the recipient is either (i) a nonprofit organization or foundation that supports projects that will benefit the class or similarly situated persons, or that promotes the law consistent with the objectives and purposes of the underlying cause of action, (ii) a child advocacy program, or (iii) a nonprofit organizations providing civil legal services to the indigent. (See Code Civ. Proc., § 384, subd. (b).) In particular, that declaration shall describe the history of the recipient, the types of projects that it has conducted or supported over the last five years, and any particular use to which it would intend to devote the unpaid residue if received.

d. In the Court's view, Code of Civil Procedure section 384, subdivision (b), lists the possible recipients of unpaid residue in a descending order of preference. If the *cy pres* recipient proposed by the parties is one involved in child advocacy or that provides civil legal services to the indigent, the motion shall include a declaration explaining why the parties did not propose an organization that will either "benefit

6

the class or similarly situated persons, or . . . promote the law consistent with the objectives and purposes of the underlying cause of action."

3. The motion shall discuss the proposed method of giving notice, the alternative methods considered, and the reasons that the proposed method is the one most likely to give actual notice to the greatest number of class members. If the identities of the class members are not known, the parties shall consider publication of notice in print, on the web, and through social media.

4. If the settlement requires the class members to submit claims, the motion shall explain why a claim process is reasonably necessary. If the defendant knows (a) the identity of the class members, (b) their addresses or former addresses, and (c) the facts necessary to calculate the recovery of each class member, the Court will require a strong showing of necessity for a claims process.

5. Any release to be given by the participating class members (other than the class representatives) shall be limited to:

   a. The defendants named in the complaint, together with their officers, directors, employees and agents. If any other parties are sought to be released, the motion shall both (i) identify those other parties by name and (ii) explain the facts that justify their inclusion.

   b. The claims stated in the complaint and those based on the facts alleged in the complaint.

6. If the settlement contemplates the use of an administrator to implement the terms of the settlement, the motion shall be supported by a declaration describing the administrator's competence, the fee to be charged by the administrator, and whether that fee is (a) fixed, (b) hourly, or (c) hourly with a cap. If the fee is fixed, the declaration shall explain how the price was calculated.

7. The settlement agreement shall describe how the value of any uncashed checks will be distributed.

8. If the settlement includes compensation for unpaid wages, the settlement agreement shall describe how the employer's share of any applicable payroll taxes will be handled. The Court suggests that the employer's share not be paid out of the gross settlement fund. The Court is not likely to include the amount of those payments when calculating the plaintiff's counsel's percentage attorney's fee.

9. The documents that will be read by or used by the class members – the proposed notice, objection form, exclusion form, and any claim form – shall be drafted in a manner that is likely to be readily understood by the members of the class. To assist the Court in determining whether those documents comply with that directive, the motion shall include evidence concerning the likely age, education, and experience of the class members, and of their ability to read and comprehend English.

The Order

7

10. The proposed order shall include, as attachments to the order, the proposed notice, proposed exclusion form, proposed objection form, and any proposed claim form. The Court is likely to modify those proposed forms. Therefore, the Court will not issue an order that merely incorporates by reference the forms attached to the settlement agreement. The settlement agreement must be filed, but should not also be attached to the proposed order.

11. Counsel shall carefully review both the terms and the terminology of the proposed order and accompanying forms (proposed notice, objection form, exclusion form, and claim form, if any) to confirm that the various documents are consistent with each other and with the settlement agreement.

12. The proposed order shall provide that the notice shall be accompanied by an objection form that the class members may use. If the objection forms are to be submitted to the administrator rather than the court, then the order shall require the administrator to submit any timely objections to the court by a declaration filed concurrently with the plaintiffs' motion for final approval.

13. The proposed order shall provide that the notice shall be accompanied by an exclusion (or "election not to participate") form that the class members may use.

14. The proposed order shall state the name of any settlement administrator, and shall describe the nature of the services that the administrator will be required to perform, either directly or by reference to the settlement agreement.

15. The proposed order shall not require an objecting party to do either of the following:

   a. To appear, either personally or through counsel, at the hearing on the motion for final approval for that party's objection to be considered.

   b. To file or serve a notice of intention to appear at the hearing on the motion for final approval.

16. The order shall require that either counsel or the administrator give notice to any objecting party of any continuance of the hearing of the motion for final approval.

17. If the proposed order includes a provision enjoining the class members from filing any actions or administrative claims or proceedings pending the final hearing on the settlement, or for any other period, the motion shall include citations to authority for the issuance of such an injunction without notice to or opportunity to be heard by the individuals to be enjoined.

18. If notice is to be given by mail, and if the class members will be required to submit a claim form, the order shall provide:

   a. That the notice be accompanied by a stamped envelope addressed to the claims administrator; and

8

b.    That the claims administrator be required to send a reminder notice to every class member from whom no claim or exclusion request is received within 30 days of mailing the notice.

## Notice

19.    Unless the notice describes the approximate recovery by the individual class member to whom the notice is sent, the notice shall include an estimate of the likely recovery by the average class member. If the recovery by different members will vary, the notice shall also include an estimate of the range of possible recoveries.

20.    To avoid discouraging any dissenting class members from objecting to the proposed settlement, the notice should clearly indicate that the Court has determined only that there is sufficient evidence to suggest that the proposed settlement might be fair, adequate, and reasonable, and that any final determination of those issues will be made at the final hearing.

21.    The notice shall advise the class members of where they can find the settlement agreement, by describing (a) the full title and filing date of the declaration or other document to which it is attached when filed with the Court, (b) the address of the courthouse to which the case is assigned, and (c) the address of the court's website at which the case file can be viewed on-line.

## Claim Form

22.    The information required to be provided by the class member on any claim form shall not exceed the minimum information necessary to process the claim.

## Objection Form

23.    The proposed order shall include an objection form. If the agreement provides that the objection form is to be filed with the court rather than submitted to the administrator, then it shall comply with California Rules of Court, rule 2.111.

24.    The information required to be provided by an objecting class member on the objection form shall not exceed the minimum information necessary to (a) identify the objector as a person entitled to object to the settlement and (b) to describe the nature of the objection.

25.    If a claim must be submitted to participate in the settlement, the objection form shall remind the objector that, to participate in the settlement in the event that the objection is overruled, the objector must also submit a claim.

## PAGA Penalties

26.    If the settlement provides for the payment of penalties under PAGA, the motion shall be accompanied by a declaration describing how the penalties were calculated and otherwise establishing facts sufficient to allow the Court to review and approve those penalties as required by Labor Code section 2699, subdivision (*l*).  If the agreed-upon amount of the penalties is less than the statutory maximum, the declaration shall explain why greater

9

penalties would be unjust, arbitrary and oppressive, or confiscatory. (*Id.*, subd. (e)(2); *Amaral vs. Cintax Corp. No. 2* (2008) 163 Cal.App.4[th] 1157, 1213-1214.)

Revised Documents

27.     If the Court either denies the motion or continues the hearing on the motion, and if the plaintiff thereafter files any amended stipulation, proposed order, or other document in support of either that motion or a renewed motion, the plaintiff shall submit directly to the clerk of Department 5 a declaration authenticating a "red-lined" version of the amended document, showing how the earlier version was modified.

## H.    MOTIONS FOR FINAL APPROVAL OF A SETTLEMENT

If the matter is settled and a motion for final approval of the settlement is filed:

1.     The order granting preliminary approval will set the date for the hearing on the plaintiff's motion for final approval. Promptly after the entry of that order, the plaintiff shall reserve a law and motion hearing on the date set in the order.

2.     Any request for a "service," "enhancement," or "incentive" payment to a named class representative shall be supported by a declaration from the proposed recipient in which the declarant (a) describes the services performed by the declarant to further the prosecution of the action, (b) estimates the time incurred by the declarant in performing those services, (c) describes any risks undertaken by the declarant in prosecuting the action, (d) describes any adverse consequences actually suffered by the declarant as a result of prosecuting the action, and (e) describes any benefits received by the declarant as a result of prosecuting the action.

3.     Any request for compensation for the services of any claims administrator shall be supported by a declaration from the claims administrator describing (a) the services performed, (b) the time incurred to perform those services, and (c) either the hourly rate charged for those services or the agreed-upon flat fee.

4.     Any request for compensation for attorney's fees shall be supported by a declaration that:

   a.     Authenticates copies of the time records maintained by the plaintiff's attorneys for the services performed in this case. If no time records were maintained, then the declaration shall state that fact, and shall (i) state the date on which legal services were provided, (ii) describe in detail the nature of those services, (iii) estimate the time incurred in performing those services, and (iv) describe the basis for that estimate.

   b.     Describes both (i) the hourly rate or rates customarily charged by each attorney for that attorney's time during the period in which those services were performed, and (ii) the attorney's experience and expertise that justify such a rate.

10

5.   Any request for compensation for expenses incurred by the plaintiff's attorneys shall be supported by a detailed declaration or other evidence describing the date, nature, and amount of each expense incurred.

6.   The order granting the motion for final approval shall set a deadline for the filing of a report concerning the amount of money distributed. (Code Civ. Proc., § 384, subd. (b).)

7.   Because it would potentially expose the class members to a contempt charge, the judgment shall not bar or otherwise enjoin the class members from prosecuting the released claims.

8.   Neither the proposed order nor the proposed judgment shall provide for the dismissal of the action.  (Cal. Rules of Court, rule 3.769(h).)

9.   Any report pursuant to Code of Civil Procedure section 384, subdivision (b), shall be in the form of a declaration from the administrator or other declarant with personal knowledge of the facts, and shall be accompanied by a proposed amended judgment.

10.  If the Court either denies the motion for final approval or continues the hearing on the motion, and if the plaintiff thereafter files any amended stipulation, proposed order or judgment, or other document in support of either that motion or a renewed motion, the plaintiff shall submit directly to the clerk of this department a declaration authenticating a "red-lined" version of the amended document, showing how the earlier version was modified.

I.   Other

_X__   The Case Management Conference currently scheduled for August 3, 2016, is continued to August 5, 2016, at 10:00 A.M.

____   The status conference currently set for ___, 2016, is vacated.


Craig G. Riemer, Judge of the Superior Court


11

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
4050 Main Street
Riverside, CA  92501
www.riverside.courts.ca.gov

CLERK'S CERTIFICATE OF MAILING

MELQUIADES BONILLA

        vs.                          CASE NO. RIC1606640

21ST CENTURY ONCOLOGY OF CALIFORNIA

TO:

I certify that I am currently employed by the Superior Court of
California, County of Riverside and I am not a party to this action
or proceeding. In my capacity, I am familiar with the practices and
procedures used in connection with the mailing of correspondence. Such
correspondence is deposited in the outgoing mail of the Superior
Court. Outgoing mail is delivered to and mailed by the United States
Postal Service, postage prepaid, the same day in the ordinary course
of business. I certify that I served a copy of the attached
Judge Craig G. Riemer on this date, by depositing
said copy as stated above.

                          Court Executive Officer/Clerk

Dated: 06/01/16           by:

                          SUSAN M SALAZAR, Deputy Clerk

Exhibit A, Page 49

Notice 'CCMN' has been printed for the following Attorneys/Firms
or Parties for Case Number RIC1606640 on  6/01/16:

ROBINSON CALCAGNIE INC
19 CORPORATE PLAZA DR
NEWPORT BEACH, CA 92660

JUN 0 1 2016

1   ERIC A. GROVER (SBN 136080)
    eagrover@kellergrover.com
2   CAREY G. BEEN (SBN 240996)
    cbeen@kellergrover.com
3   **KELLER GROVER LLP**
    1965 Market Street
4   San Francisco, California  94103
    Telephone:  (415) 543-1305
5   Facsimile:    (415) 543-7861

6   Attorneys for Plaintiffs and Petitioners

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUN 01 2016

C. Marias

7

8             SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               IN AND FOR THE COUNTY OF RIVERSIDE

                   RIC 1606640

10

11   JAMES CORBEL and ROXANNE HAATVEDT
    individually and on behalf of a class of similarly
12   situated individuals,

13                Plaintiff,

14   v.

15   21ST CENTURY ONCOLOGY OF
    CALIFORNIA, A MEDICAL CORPORATION;
16   21ST CENTURY ONCOLOGY HOLDINGS,
    INC.; and DOES 1 through 10, inclusive,
17

18               Defendants.

19   DANIEL PADILLA, on behalf himself and all
    others similarly situated,
20

21               Plaintiff,

22   v.

23   21ST CENTURY ONCOLOGY OF
    CALIFORNIA, A MEDICAL CORPORATION;
24   21ST CENTURY ONCOLOGY HOLDINGS,
    INC.; and DOES 1 through 20,
25

26               Defendants.

Judicial Council Coordination Proceeding
No. _____

Alameda County Superior Court Case No.
RG16813084;
Alameda County Superior Court Case No.
RG16817512; and
**Riverside County Superior Court Case No.
RIC1606640**

**NOTICE OF SUBMISSION OF PETITION FOR
COORDINATION OF THIS CASE INTO A
JCCP**

[Cal Rule of Court 3.522]

By Fax

27

28

                                 1

NOTICE OF SUBMISSION OF PETITION FOR COORDINATION OF THIS CASE INTO A JCCP

MELQUIADES BONILLA, on behalf himself
and all others similarly situated,

    Plaintiff,

v.

21ST CENTURY ONCOLOGY OF
CALIFORNIA, a medical corporation; 21ST
CENTURY ONCOLOGY HOLDINGS, INC.;
and DOES 1 through 20,

    Defendants.

TO THE CLERK OF COURT, THE COURT, EACH PARTY, AND ALL COUNSEL OF RECORD:

    PLEASE TAKE NOTICE that on May 31, 2016, a petition for coordination was submitted by Petitioners JAMES CORBEL and ROXANNE HAATVEDT, by and through their counsel, Eric A. Grover, Esq. and Carey G. Been, Esq. of Keller Grover LLP, 1965 Market Street, San Francisco, California 94103, to the Chair of the Judicial Council requesting assignment of a judge to determine whether coordination of this action with other similar actions is appropriate. Petitioners are the plaintiffs in *Corbel, et al. v. 21st Century Oncology of California, et al.*, Alameda County Superior Court Case No. RG16813081. A true and correct copy of said petition for coordination is attached hereto, to be filed in the above-named courts.

    Any written opposition to the Petition for Coordination must be submitted and served at least nine court days before the hearing date.

    Respectfully submitted,

Dated: May 31, 2016              KELLER GROVER LLP

                         By:  _____
                              ERIC A. GROVER
                              CAREY BEEN
                              Attorneys for Plaintiffs and Petitioners

2

# EXHIBIT 1

1   ERIC A. GROVER (SBN 136080)
    eagrover@kellergrover.com
2   CAREY G. BEEN (SBN 240996)
    cbeen@kellergrover.com
3   **KELLER GROVER LLP**
    1965 Market Street
4   San Francisco, California 94103
    Telephone:   (415) 543-1305
5   Facsimile:    (415) 543-7861

6   **Attorneys for Plaintiffs and Petitioners**

7

8               JUDICIAL COUNCIL OF CALIFORNIA

9               CHAIR OF THE JUDICIAL COUNCIL

10  JAMES CORBEL and ROXANNE HAATVEDT    Judicial Council Coordination Proceeding
    individually and on behalf of a class of similarly  No. _____
11  situated individuals,
                              Alameda County Superior Court Case No.
12           Plaintiff,          RG16813081

13  v.

14  21ST CENTURY ONCOLOGY OF         **PETITION FOR COORDINATION**
    CALIFORNIA, A MEDICAL CORPORATION;
15  21ST CENTURY ONCOLOGY HOLDINGS,   [Filed concurrently with supporting Memorandum of
    INC.; and DOES 1 through 10, inclusive,    Points and Authorities and Declaration of Eric A.
16                             Grover]
            Defendants.
17

18

19

20      TO THE HONORABLE TANI CANTIL-SAKAUYE, CHAIR OF THE JUDICIAL

21  COUNCIL, CHIEF JUSTICE OF CALIFORNIA, SUPERIOR COURTS, THE PARTIES TO

22  THE ACTIONS, AND TO THEIR COUNSEL OF RECORD:

23      PLEASE TAKE NOTICE that, pursuant to the California Code of Civil Procedure section

24  404, et seq., and California Rules of Court 3.500, et seq., Plaintiffs and Petitioners JAMES CORBEL

25  and ROXANNE HAATVEDT, by and through their counsel, Keller Grover LLP, 1965 Market Street,

26  San Francisco, California 94103, respectfully submits this request to the Chair of the Judicial Council

27  to coordinate the following cases involving public disclosure of Plaintiffs' private health and medical

28  information:  *Corbel, et al. v. 21st Century Oncology of California, et al.*, Alameda County Superior

1

PETITION FOR COORDINATION

1  Court Case No. RG16813081 ("Corbel"); *Padilla v. 21st Century Oncology of California, et al.*,

2  Alameda County Superior Court Case No. RG16817512 ("Padilla"); and *Bonilla v. 21st Century*

3  *Oncology of California, et al.*, Riverside County Superior Court Case No. RJC1606640 ("Bonilla").

4  Petitioners are not aware of any other actions that share common questions of law or fact. Petitioners

5  respectfully request that one of the three judges on the Alameda County Superior Court Complex Civil

6  Panel (Hon. George C. Hernandez, Jr., Hon. Winifred Smith and Hon. Brad Seligman) be assigned to

7  determine whether coordination of these actions is appropriate.

8      This Petition for Coordination (the "Petition") is made pursuant to Section 404 of the California

9  Code of Civil Procedure ("CCP") and Rule 3.521 of the California Rules of Court ("CRC") on the

10  ground that one judge hearing both actions for all purposes in the Superior Court for the County of

11  Alameda will promote the ends of justice, for the following reasons:

12      • All of the aforementioned actions allege identical or virtually identical legal and factual

13        theories, are based upon the exact same events and thus have overlapping or the same

14        putative class members, and contain the same cases of action on behalf of putative classes;

15      • The cases involve most of the same defendants that will presumably be represented by the

16        same counsel;

17      • Coordination will further the efficient utilization of judicial resources and avoid the

18        unnecessary duplication of judicial resources;

19      • Coordination will further the convenience of the parties, witnesses and counsel;

20      • Coordination will avoid the disadvantages of duplicative or inconsistent rulings, orders and

21        judgements; and

22      • Coordination will increase the possibility of settlement and resolution of the disputed

23        matters.

24      Satisfaction of such grounds are more particularly set forth in the accompanying Declaration of

25  Eric A. Grover, memorandum of points and authorities, and other supporting documents. The actions

26  and joined actions fall within the definition of "complex litigation" under Section 19 of the Standards

27

28

2

Exhibit A, Page 55

of Judicial Administration and Rule 3.400 et seq., of the California Rules of Court. *See* the Declaration of Eric A. Grover filed herewith.

Proof of filing in each included action of a Notice of Submission of Petition for Coordination and a copy of this Petition pursuant to Rule 3.522 of the California Rules of Court, and any documents to be submitted pursuant to Rule 3.523 of the California Rules of Court will be submitted to the Chair of the Judicial Council within the time frames provided by Rules 3.522 and 3.523.

Please take further notice that any written opposition or response to the herein Petition for Coordination must be filed and served at least nine court days before the hearing date set on this Petition. A hearing on this petition for coordination is hereby requested.

Respectfully submitted,

Dated: May 31, 2016                    KELLER GROVER LLP

By:    *E A Grover*
       ERIC A. GROVER
       CAREY BEEN
       Attorneys for Plaintiffs and Petitioners

Exhibit A, Page 56

1  ERIC A. GROVER (SBN 136080)
   eagrover@kellergrover.com
2  CAREY G. BEEN (SBN 240996)
   cbeen@kellergrover.com
3  KELLER GROVER LLP
   1965 Market Street
4  San Francisco, California 94103
   Telephone:    (415) 543-1305
5  Facsimile:    (415) 543-7861

6  Attorneys for Plaintiffs and Petitioners

7

8              JUDICIAL COUNCIL OF CALIFORNIA

9              CHAIR OF THE JUDICIAL COUNCIL

10 JAMES CORBEL and ROXANNE HAATVEDT     | Judicial Council Coordination Proceeding
   individually and on behalf of a class of similarly | No. _____
11 situated individuals,                             |
                                                     | Alameda County Superior Court Case No.
12            Plaintiff,                             | RG16813081
13 v.                                                | MEMORANDUM OF POINTS AND
                                                     | AUTHORITIES IN SUPPORT OF PETITION
14 21ST CENTURY ONCOLOGY OF                          | FOR COORDINATION
   CALIFORNIA, A MEDICAL CORPORATION;                |
15 21ST CENTURY ONCOLOGY HOLDINGS,                   |
   INC.; and DOES 1 through 10, inclusive,           |
16                                                   |
17            Defendants.                            |

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

California law authorizes the coordination of complex cases pending in different courts whenever they share a common question of law or fact. CCP § 404. The statute seeks to coordinate these types of cases to promote the efficient use of judicial resources and to facilitate resolution of all actions. CCP § 404.1 (factors to be considered). Petitioner seeks to coordinate in Alameda County Superior Court three complex actions: (1) *Corbel, et al. v. 21st Century Oncology of California, et al.*, Alameda County Superior Court Case No. RG16813081 ("Corbel"); *Padilla v. 21st Century Oncology of California, et al.*, Alameda County Superior Court Case No. RG16817512 ("Padilla"); and (3) *Bonilla v. 21st Century Oncology of California, et al.*, Riverside County Superior Court Case No. RIC1606640 ("Bonilla"). Since all three actions assert virtually identical allegations against the same Defendants, coordination is appropriate.

All three actions relate to allegations that Defendants 21st Century Oncology of California and 21st Century Oncology Holdings, Inc. (collectively "Defendants") publicly disclosed the private health and medical information of at least 50,000 people in California starting as early as October 3, 2015. All three actions are putative class actions seeking relief for some of the alleged violation of the Confidentiality of Medical Information Act (Civil Code § 56 *et seq.*). Petitioner anticipates that the law firm that ultimately represents all Defendants will be the same in each action.

Coordinating the three actions "will promote the ends of justice" as required under CCP sections 404 and 404.1. All three cases involve nearly identical allegations and will likely seek similar discovery, especially since the same defendants are named in all three actions. Coordination will save the courts and parties significant resources by avoiding duplicative motions and discovery and prevent inconsistent rulings, while also promoting settlement. Two of the three complaints have been filed in Alameda County Superior Court. If the cases are coordinated in Alameda County Superior Court, the parties will benefit from the Court's familiarity and background. Additionally, the parties will not burden multiple courts of this state with nearly identical complaints and legal and factual theories. Moreover, coordination will hasten settlement and resolution of both actions.

1

Finally, CCP section 404 authorizes coordination of these actions because all are complex pursuant to California Rule of Court 3,400(b). The cases will include the following: (1) numerous pretrial motions raising difficult or novel legal issues that will be time-consuming to resolve; (2) management of a large number of witnesses or a substantial amount of documentary evidence; and (3) coordination with related actions pending in one or more courts in other counties.

Therefore, Petitioner respectfully requests that coordination of the three cases and others that may be filed be granted and that Alameda County be designated as the coordination venue.

## II.    FACTUAL BACKGROUND

### A.    The *Corbel* Action

On April 25, 2016, Plaintiffs James Corbel and Roxanne Haatvedt, as class representatives, filed a putative class action lawsuit against 21st Century Oncology of California and 21st Century Oncology Holdings, Inc. in Alameda County Superior Court. The *Corbel* action alleges a claim for violation of California's Confidentiality of Medical Information Act ("CMIA"), Civil Code § 56, *et seq. See Corbel* Complaint, Declaration of Eric A. Grover ("Grover Decl.) at ¶ 5, Ex. B.

The *Corbel* action is brought on behalf of a class of California residents whose private medical and health information, including, but not limited to, patient names, Social Security numbers, physician's names, diagnoses, treatment information and insurance information, was exposed to and accessed or acquired by an unauthorized third party. *See* Grover Decl. at ¶ 5, Ex. B. The Plaintiffs in this case are represented by Eric A. Grover (State Bar No. 136080) and Carey G. Been (State Bar No. 240996) of Keller Grover LLP, 1965 Market Street, San Francisco, California 94103. The complaint was personally served on 21st Century Oncology of California on May 3, 2016 and by certified mail on 21st Century Oncology Holdings, Inc. on May 13, 2016. Although, neither Defendant has made an appearance in the *Corbel* action, an attorney from the law firm of Baker Hostetler LLP has contacted counsel for the *Corbel* Plaintiffs on behalf of Defendants. No pretrial or discovery motions are currently pending in this matter. The Complex Determination Hearing is scheduled for June 7, 2016 at 3:00 p.m. in Department 30 (Hon. Brad Seligman). A Case Management Conference is set for July 12, 2016 at 3:00 p.m. in Department 30 (Hon. Brad Seligman).

2

B.    **The *Padilla* Action**

The *Padilla* action was filed in Alameda County Superior Court on May 27, 2016, and alleges a claim for violation of the CMIA, California Civil Code § 56, *et seq.*  *See Padilla* Complaint, Grover Decl. at ¶ 6, Ex. C.  Like *Corbel*, *Padilla* is brought on behalf of a class of California residents whose private medical and health information was exposed to and accessed or acquired by an unauthorized third party.  *See* Grover Decl., Exhs. B and C.  Plaintiff Padilla is represented by Neil B. Fineman (State Bar No. 117915), Fineman Poliner LLP, 155 N. Riverview Drive, Anaheim Hills, CA 92808.  This case was only recently filed.  No pretrial or discovery motions have been filed or orders issued in the action.  The Court has not yet scheduled the Complex Determination Hearing or initial Case Management Conference.

C.    **The *Bonilla* Action**

The *Bonilla* action was filed in Riverside County Superior Court on May 31, 2016, and alleges, a claim for violation of the CMIA, Civil Code § 56, *et seq.  See Bonilla* Complaint, Grover Decl. at ¶ 7, Ex. D.  Like *Corbel* and *Padilla*, *Bonilla* is brought on behalf of a class of California residents whose private medical and health information was exposed to and accessed or acquired by an unauthorized third party.  *See* Grover Decl., Exhs. B, C and D.  Plaintiff Bonilla is represented by Daniel S. Robinson (State Bar No. 244245) and Wesley K. Polischuk (State Bar No. 254121), Robinson Calcagnie, Inc., 19 Corporate Plaza Drive, Newport Beach, California 92660.  This case was only recently filed and no pretrial or discovery motions have been filed or orders issued in the action.

III.    **COORDINATION OF THESE ACTIONS IS PROPER AND WILL PROMOTE THE ENDS OF JUSTICE**

Coordination promotes "judicial efficiency and economy by providing for the unified management of both pretrial and trial phases of the coordinated cases." *Citicorp North Am., Inc. v. Sup. Ct.*, 213 Cal. App. 3d 563, 565 n.3 (1989).  CCP section 404 governs the method for coordination when complex cases share a common question of law or fact.  Coordination is proper when two requirements are met: (1) the actions are "complex" as defined by the Judicial Council, and (2) the actions meet the coordination criteria set forth in CCP section 404.1. CCP § 404.  Specifically, the Court must consider

3

Exhibit A, Page 60

1  whether coordination promotes the ends of justice by taking into account whether: the common

2  question of fact or law predominates and is significant to the litigation; the convenience of the parties,

3  witnesses, and counsel; the relative development of the actions and the work product of counsel; the

4  efficient utilization of judicial facilities and manpower; the calendar of the courts; the disadvantages of

5  duplicative and inconsistent rulings, orders, or judgments; and, the likelihood of settlement of the

6  actions without further litigation should coordination be denied. CCP §§ 404, 404.1.

7      Each plaintiff in any of the three actions is entitled to petition the Chair of the Judicial Council

8  for coordination. CCP § 404. CCP section 404 reads in pertinent part: "a petition for coordination may

9  be submitted to the Chair of the Judicial Council, by the presiding judge of any such court, or by any

10 party to one of the actions after obtaining permission from the presiding judge; or by all of the parties

11 plaintiff or defendant in any such action." *Id.* (emphasis added.) Thus, when the petition is made by all

12 of the plaintiffs to any action that is a subject of the petition, as is the case here, no permission is

13 needed from the presiding judge to such action.[1] This Petition meets all of the Code's requirements and

14 should be granted.

15      A.    **The Actions Are Complex**

16      These three actions constitute complex litigation under Section 19 of the Standards of Judicial

17 Administration and Rule 3.400, *et seq.* of the California Rules of Court and, thus, satisfy the first prong

18 for coordination. The cases will include the following: (1) numerous pretrial motions raising difficult

19 or novel legal issues that will be time-consuming to resolve; (2) management of a large number of

20 witnesses or a substantial amount of documentary evidence; and (3) coordination with related actions

21 pending in one or more courts in other counties.

22      B.    **Common Questions Of Fact Or Law Are Predominating And Significant**

23      The allegations of *Padilla* and *Bonilla* are factually and legally indistinguishable to the

24 allegations of Petitioners in their complaint. With the exception of different named class

25 representatives, the factual predicates of the three actions are the exact same – Defendants' public

26

27

28  [1] Moreover, counsel in all three cases support this petition for coordination. Grover Decl. at ¶ 9.

MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING PETITION FOR COORDINATION

1   disclosure of private medical and health information. In all three actions, Plaintiffs allege essentially

2   the same legal causes of action and sued the same entities as well.

3   C.    These Cases Meet The Requirements Of California CCP Section 404.1

4   CCP section 404.1 sets forth the following criteria for coordination:

5       Coordination of civil actions sharing a common question of fact or law is appropriate if
        one judge hearing all of the actions for all purposes in a selected site or sites will promote
6       the ends of justice taking into account whether the common question of fact or, law is
        predominating and significant to the litigation; the convenience of the parties, witnesses,
7       and counsel; the relative development of the actions and the work product of counsel; the
        efficient utilization of judicial facilities and manpower; the calendar of the courts;
8       disadvantages of duplicative and inconsistent rulings, orders, or judgments; and, the
        likelihood of settlement of the actions without further litigation should coordination be
9       denied.

10

11      A court must weigh and balance all of these factors when considering a petition for

12  coordination. Pesses v. Sup. Ct., 107 Cal. App. 3d 117, 125-26 (1980). Here, coordination of the three

13  actions meets the foregoing criteria, as explored in detail below.

14      1.    Plaintiffs In The Actions Allege Common Questions Of Fact And Law That

15           Predominate And Are Significant To The Litigation

16      As set forth above, the factual predicate of all three actions are one in the same and the actions

17  make nearly identical allegations against Defendants as the Petitioners – the public disclosure of private

18  medical and health information of the Plaintiffs and putative class. These cases also assert essentially

19  the same causes of action and ask for the relief, including injunctive relief and nominal damages of

20  $1,000 per violation available under California Civil Code § 56.36(b)(1). Clearly, the matters involve

21  the same questions of law and fact because all assert the same core claims on behalf of overlapping

22  classes.

23      2.    Coordination Will Promote The Efficient Use of Judicial Resources And

24           Will Advance The Convenience Of The Parties, Witnesses And Counsel

25      Coordination will promote the efficient use of judicial resources and will accommodate the

26  convenience of all counsel by preventing the duplication of effort and the costly adjudication of the

27  same or substantially similar motions, such as demurrers, judgment on the pleadings, class certification

28  and summary judgment. Coordination will avoid duplicative testimony at trial and during depositions.

5

MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING PETITION FOR COORDINATION

Many witnesses are likely to be identical given the same Defendants are named in all three complaints. Thus, coordination will benefit the probable witnesses. Coordination also will advance the convenience of counsel by conserving their resources through cooperative discovery that will benefit all parties. As one court has held, "[t]he preparation for trial in terms of depositions, interrogatories, admissions...etc., will be better achieved if done in a coordinated manner." *McGhan Med Corp. v. Sup. Ct.*, 11 Cal. App. 4th 804, 814 (1992). Judicial resources will also be conserved in overseeing settlement negotiations.

### 3.    The Relative Development Of The Actions Weigh In Favor Of Coordination

A petition for coordination "may be made at any time after filing of the complaint." (Cal. Rule Ct. 3.521(a)). Coordination is particularly appropriate now because each case was just recently filed – the *Corbel* case was filed on April 25, 2016, the *Padilla* case was filed on May 27, 2016, and the *Bonilla* case was filed on May 31, 2016. The need for coordination is immediately apparent and will only increase as the cases develop. No party will be prejudiced by coordination. No party will benefit from any delay in coordination; in fact, delay will result only in duplicative efforts and rulings, wasting the resources of the courts, counsel and the parties.

### 4.    Coordination Will Unburden The Calendars Of The Courts

The actions are pending in Alameda County and Riverside County Superior Courts. Coordination will unburden the judicial system by avoiding adjudication of three lawsuits involving common questions of fact and law. All three actions seek relief for the same conduct – the public disclosure of private medical and health information – allegedly made by the same Defendants. Since motion practice, discovery, witnesses and other aspects of litigation in these cases undoubtedly will track one another, coordination will unburden the Court from needlessly adjudicating the same case.

### 5.    Refusal To Coordinate May Result In Duplicative And Inconsistent Rulings

The three actions likely will involve significant motion practice. Coordination will ensure uniform and consistent rulings on these motions. By contrast, allowing these cases to proceed independently will result in multiple courts determining the same issues, via the same motions, including demurrers, class certification and summary judgment. Not only does this create the potential

6

1   for inconsistent rulings, but the rulings will be subject to review in different Courts of Appeal. A single

2   court should resolve such motions and be subject to review in one Court of Appeal.   Indeed, the

3   California Court of Appeals advocates coordination as a means of achieving consistency in judicial

4   rulings:

5       The rulings on...motions should be uniform.   If possible, trial rulings should be
        accomplished in a manner permitting uniform and centralized resolution on appeal. This
6       sort of treatment can be achieved by coordination of motion practice.

7   *McGhan Med. Corp.*, 11 Cal. App. 4th at 814.  Coordination of the three actions will achieve this end.

8       6.      **Settlement Will Become More Complicated If The Court Does Not**

9               **Coordinate The Cases**

10      The final factor to be considered under CCP section 404.1 is "the likelihood of settlement of the

11  actions without further litigation should coordination be denied."   It is unlikely that denial of

12  coordination would foster settlement – in fact, it would likely do the opposite.  The included actions are

13  in litigation on multiple claims and significant issues.   With potentially millions of dollars at stake,

14  these cases are sure to be vigorously litigated.  Generally, coordination assists in the settlement process

15  because the parties, at the Court's urging, are required to create organized plans for mediation or

16  settlement.   If experience is a guide, coordination should lead to greater efficiencies in the litigation

17  process, and to coordinated settlement discussions.

18  IV.   **THE ACTIONS SHOULD BE COORDINATED IN ORANGE COUNTY SUPERIOR**

19        **COURT**

20      Should this Petition be granted, the Alameda County Superior Court should be selected as the

21  site for the coordinated proceedings.  The Alameda County Superior Court assigns one of three specific

22  judges to hear complex actions.  This program permits those judges to gain invaluable expertise in

23  presiding over unwieldy and complex cases.  One of those judges – the Honorable Brad Seligman – is

24  already scheduled to preside over the Complex Determination Hearing and initial Case Management

25  Conference in the *Corbel* action.  All of these factors strongly favor Alameda County as the forum that

26  most likely will promote judicial efficiency. *See* CRC 3.530.

27

28

7

**V.    CONCLUSION**

For the foregoing reasons, Petitioners respectfully requests that their Petition for Coordination be granted.

Respectfully submitted,

Dated: May 31, 2016

KELLER GROVER LLP

By:

ERIC A. GROVER
CAREY BEEN
Attorneys for Plaintiffs and Petitioners

MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING PETITION FOR COORDINATION

Exhibit A, Page 65

1   ERIC A. GROVER (SBN 136080)
    eagrover@kellergrover.com
2   CAREY G. BEEN (SBN 240996)
    cbeen@kellergrover.com
3   KELLER GROVER LLP
    1965 Market Street
4   San Francisco, California 94103
    Telephone:   (415) 543-1305
    Facsimile:   (415) 543-7861
6   Attorneys for Plaintiffs and Petitioners

7                    JUDICIAL COUNCIL OF CALIFORNIA

8                    CHAIR OF THE JUDICIAL COUNCIL

9

10  JAMES CORBEL and ROXANNE HAATVEDT        Judicial Council Coordination Proceeding
    individually and on behalf of a class of similarly   No. _____
11  situated individuals,
                                                  Alameda County Superior Court Case No.
12                  Plaintiff,                    RG16813081

13  v.                                            DECLARATION OF ERIC A. GROVER IN
                                                  SUPPORT OF PETITION FOR
14  21ST CENTURY ONCOLOGY OF                      COORDINATION
    CALIFORNIA, A MEDICAL CORPORATION;
15  21ST CENTURY ONCOLOGY HOLDINGS,              [Filed concurrently Petition for Coordination and
    INC.; and DOES 1 through 10, inclusive,      Supporting Memorandum of Points and Authorities]
16
                    Defendants.
17

18

19       I, Eric A. Grover, declare:

20       1.     I am an attorney at law duly licensed to practice law in all courts of the State of

21  California and am a partner with the law firm of Keller Grover LLP, counsel for Plaintiffs and

22  Petitioners JAMES CORBEL and ROXANNE HAATVEDT. I have personal knowledge of the

23  matters set forth herein, and if called upon to testify, would be competent to do so under oath.

24       2.     This petition is brought for the purpose of seeking coordination of three complaints,

25  which involve claims of four plaintiffs. Each complaint is filed on behalf of a putative class of

26  approximately 55,000 individuals and asserts causes of action arising out of the public disclosure of

27  Plaintiffs' private health and medical information by Defendants 21st Century Oncology of California

28  and 21st Century Oncology Holdings, Inc. (collectively "Defendants"). Each complaint asserts causes

                                             1
    DECLARATION OF ERIC A. GROVER IN SUPPORT OF PETITION FOR COORDINATION

1   of action arising from common claims and allegations against the Defendants and each involves

2   identical issues of law.

3        3.    The Petitioner seeks to coordinate the following cases:

4          •   *Corbel, et al. v. 21st Century Oncology of California, et al.*, Alameda County

5            Superior Court Case No. RG16813081 ("Corbel");

6          •   *Padilla v. 21st Century Oncology of California, et al.*, Alameda County Superior

7            Court Case No. RG16817512 ("Padilla"); and

8          •   *Bonilla v. 21st Century Oncology of California, et al.*, Riverside County Superior

9            Court Case No. RIC1606640 ("Bonilla").

10       4.    The names of the parties to all known pending actions in California state courts that

11   share common questions of law or fact related to Defendants' public disclosure of Plaintiffs' private

12   health and medical information, and the names and addresses of each party's attorney of record, along

13   with the complete title of each included action, are listed in Exhibit A attached hereto.

14       5.    Attached hereto as Exhibit B is a true and correct copy of the Complaint filed in *Corbel,*

15   *et al. v. 21st Century Oncology of California, et al.*, Alameda County Superior Court Case No.

16   RG16813081.

17       6.    Attached hereto as Exhibit C is a true and correct copy of the Complaint filed in *Padilla*

18   *v. 21st Century Oncology of California, et al.*, Alameda County Superior Court Case No. RG16817512

19   ("Padilla").

20       7.    Attached hereto as Exhibit D is a true and correct copy of the Complaint filed in *Bonilla*

21   *v. 21st Century Oncology of California, et al.*, Riverside County Superior Court Case No. RIC1606640.

22       8.    The subject cases are complex pursuant to California Rule of Court 3.400(b). CRC

23   3.400 states that "a 'complex case' is an action that requires exceptional judicial management to avoid

24   placing unnecessary burdens on the court or the litigants and to expedite the case, keep costs

25   reasonable, and promote effective decision making by the court, the parties, and counsel." The three

26   aforementioned cases will include the following: (1) numerous pretrial motions raising difficult or

27   novel legal issues that will be time-consuming to resolve; (2) management of a large number of

28

2

1  witnesses or a substantial amount of documentary evidence; and (3) coordination with related actions

2  pending in one or more courts in other counties, states, or countries, or in a federal court. Thus, these

3  three cases meet the definition of complex under CRC 3.400.

4       9.    The Petition for Coordination is authorized to be directly submitted to the Judicial

5  Council because all of the plaintiffs in one of the actions are joining in the Petition. Moreover, I have

6  spoken to counsel for Plaintiffs in the *Padilla* and *Bonilla* actions and they both support this petition for

7  coordination.

8      I declare under penalty of perjury under the laws of the state of California that the foregoing is

9  true and correct and that this declaration was executed on the 31st day of May, 2016, in San Francisco,

10  California.

11

12  Eric A. Grover

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT A

Exhibit A

| Action | Plaintiff(s) and Attorneys of Record | Defendants and (Anticipated) Attorneys of Record |
|---|---|---|
| *Corbel, et al. v. 21st Century Oncology of California, et al.,* Alameda County Superior Court Case No. RG16813081 | Plaintiffs: James Corbel and Roxanne Haatvedt<br><br>Attorneys of Record for Plaintiffs Corbel and Haatvedt:<br>Eric A. Grover, (SBN 136080)<br>eagrover@kellergrover.com<br>Carey G. Been (SBN 240996)<br>cbeen@kellergrover.com<br>KELLER GROVER LLP<br>1965 Market Street<br>San Francisco,<br>California 94103<br>Telephone: (415) 543-1305<br>Facsimile: (415) 543-7861 | Defendants:<br>21st Century Oncology of California, A Medical Corporation<br>c/o Becky DeGeorge (authorized agent)<br>2710 Gateway Oaks Drive, #150N<br>Sacramento, CA 95863<br><br>and<br><br>21st Century Oncology Holdings, Inc.<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808<br><br>Note: Counsel for Defendants has not yet appeared but the following are anticipated counsel for Defendants:<br>Casie D. Collignon<br>Baker Hostetler<br>1801 California Street, Suite 4400<br>Denver, Colorado 80202-2662<br>Telephone: (303) 801-0600<br>Facsimile: (303) 861-7805 |
| *Padilla v. 21st Century Oncology of California, et al.,* Alameda County Superior Court Case No. RG16817512. | Plaintiff: Daniel Padilla<br><br>Attorneys of Record for Plaintiff Padilla:<br>Neil B. Fineman (SBN 177915)<br>Neil@FinemanPoliner.com<br>Phillip R. Poliner (SBN 156145)<br>Phillip@FinemanPoliner.com<br>FINEMAN & POLINER LLP<br>155 North Riverview Drive | Defendants:<br>21st Century Oncology of California, A Medical Corporation<br>c/o Becky DeGeorge (authorized agent)<br>2710 Gateway Oaks Drive, #150N<br>Sacramento, CA 95863<br><br>and |

| | | |
|---|---|---|
| | Anaheim Hills, California 92808-1225<br>Telephone: (714) 620-1125<br>Facsimile: (714) 701-0155 | 21st Century Oncology Holdings, Inc.<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808<br><br>Note: Counsel for Defendants has not yet appeared but the following are anticipated counsel for Defendants:<br>Casie D. Collignon<br>Baker Hostetler<br>1801 California Street, Suite 4400<br>Denver, Colorado 80202-2662<br>Telephone: (303) 801-0600<br>Facsimile: (303) 861-7805 |
| *Bonilla v. 21st Century Oncology of California, et al.,* Riverside County Superior Court Case No. RIC1606640. | Plaintiff: Melquiades Bonilla<br><br>Attorneys of Record for Plaintiff Bonilla:<br>Daniel S. Robinson (SBN 244245)<br>drobinson@rcrsd.com<br>Wesley K. Polischuk (SBN 254121)<br>wpolischuk@rcrsd.com<br>**ROBINSON CALCAGNIE, INC.**<br>19 Corporate Plaza Drive<br>Newport Beach, California 92660<br>Telephone: (949) 720-1288<br>Facsimile: (949) 720-1292 | Defendants:<br>21st Century Oncology of California, A Medical Corporation<br>c/o Becky DeGeorge (authorized agent)<br>2710 Gateway Oaks Drive, #150N<br>Sacramento, CA 95863<br><br>and<br><br>21st Century Oncology Holdings, Inc.<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808<br><br>Note: Counsel for Defendants has not yet appeared but the following are anticipated counsel for Defendants:<br>Casie D. Collignon<br>Baker Hostetler<br>1801 California Street, Suite 4400<br>Denver, Colorado 80202-2662<br>Telephone: (303) 801-0600<br>Facsimile: (303) 861-7805 |

# EXHIBIT B

ENDORSED
FILED
ALAMEDA COUNTY

APR 25 2016

CLERK OF THE SUPERIOR COURT
By____Xian-Xii Bowie

1   ERIC A. GROVER (SBN 136080)
    eagrover@kellergrover.com
2   CAREY G. BEEN (SBN 240996)
    cbeen@kellergrover.com
3   KELLER GROVER LLP
    1965 Market Street
4   San Francisco, California 94103
    Telephone:    (415) 543-1305
5   Facsimile:    (415) 543-7861

6   Attorneys for JAMES CORBEL
    and ROXANNE HAATVEDT, individually
7   and on behalf of a class of similarly
    situated individuals
8

9          SUPERIOR COURT OF THE STATE OF CALIFORNIA

10             IN AND FOR THE COUNTY OF ALAMEDA

11
                                      )  Case No. RG16813081
12  JAMES CORBEL and ROXANNE           )
    HAATVEDT individually and on behalf of a )
13  class of similarly situated individuals,  )
                                      )  CLASS ACTION
14             Plaintiff,             )
                                      )  COMPLAINT FOR DAMAGES,
15  v.                                )  RESTITUTION AND
                                      )  INJUNCTIVE RELIEF
16  21ST CENTURY ONCOLOGY OF          )
    CALIFORNIA, A MEDICAL             )
17  CORPORATION; 21ST CENTURY         )  DEMAND FOR JURY TRIAL
    ONCOLOGY HOLDINGS, INC.; and DOES )
18  1 through 10, inclusive,          )
                                      )
19             Defendants.           )
                                      )
20

21

22

23

24

25

26

27

28

    COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

BY FAX

## CLASS ACTION COMPLAINT

Plaintiffs James Corbel and Roxanne Haatvedt, on behalf of themselves and a Class of similarly situated individuals as defined herein, allege on information and belief and the investigation of their counsel as follows:

### PARTIES

1.  Plaintiff James Corbel ("Corbel") is, and at all times relevant to this complaint was, a resident of California.

2.  Plaintiff Roxanne Haatvedt ("Haatvedt") is, and at all times relevant to this complaint was, a resident of California.

3.  Corbel and Haatvedt are collectively referred to herein as "Plaintiffs."

4.  21st Century Oncology of California, A Medical Corporation is a California corporation with a principal place of business in Fort Myers, Florida.

5.  21st Century Oncology Holdings, Inc. is a Delaware corporation headquartered in Fort Myers, Florida.

6.  Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOES 1 through 10, inclusive, and therefore sue those defendants by those fictitious names ("Doe Defendants"). Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe and on that ground allege that each of the fictitiously named defendants is responsible in some manner for the occurrences alleged and that Plaintiffs' injuries and damages, as alleged, are proximately caused by those occurrences.

7.  Unless otherwise specified, "Defendants" or "21st Century Oncology" means and refers to Defendants 21st Century Oncology of California, A Medical Corporation, 21st Century Oncology Holdings, Inc. and the fictitiously named Defendants, each and all of them.

8.  At all times relevant to this complaint, Defendants acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their agency and employment with and for Defendants.

9.  Plaintiffs are informed and believe, and on that basis allege that, at all relevant

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF                                   -1-

times, each Defendant was the principal, agent, partner, joint venturer, officer, director, controlling shareholder, subsidiary, affiliate, parent corporation, successor in interest and/or predecessor in interest of some or all of the other Defendants, and was engaged with some or all of the other Defendants in a joint enterprise, and bore such other relationships to some or all of the other Defendants so as to be liable for their conduct with respect to the matters alleged below. Plaintiffs are informed and believe and thereon allege that each Defendant acted pursuant to and within the scope of the relationships alleged above, that each knew or should have known about, and authorized, ratified, adopted, approved, controlled, aided and abetted the conduct of all Defendants.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to California Civil Code § 56, *et seq.*

11.    This Court has personal jurisdiction over the parties because Defendants have continuously and systematically conducted business in the State of California. Likewise, Plaintiffs' injuries occurred in the State of California and arose out of their contact with Defendants in California.

12.    Venue is proper in this Court because California Code of Civil Procedure §§ 395 and 395.5 and case law interpreting those sections provide that if a business entity fails to designate with the office of the California Secretary of State a principal place of business in California, it is subject to being sued in any county that a plaintiff desires. On information and belief, 21st Century Oncology of California, A Medical Corporation and 21st Century Oncology Holdings, Inc. have failed to designate a principal place of business in California with the office of the Secretary of State as of the date this Complaint was filed.

## FACTUAL ALLEGATIONS

13.    21st Century Oncology is a provider of cancer care services, the largest radiation oncology provider, and one of the largest groups of urologists in the United States. Headquartered in Fort Myers, Florida, it has 145 treatment centers located in 17 states, including 24 treatment

1    centers in the state of California.

2        14.    Throughout its treatment centers, 21st Century Oncology employs or is affiliated

3   with over 900 physicians, including radiation oncologists, urologists, hematologists, gynecologic

4   oncologists, surgeons, and pathologists. 21st Century Oncology advertises that it maintains

5   specialties in a number of cancer related treatments and surgeries, including those such as radiation

6   oncology, breast cancer surgery, colorectal surgeries, and pulmonology.

7        15.    21st Century Oncology and the Doe Defendants operate treatment centers under the

8   21st Century Oncology name and under various other names. For example, in California,

9   Defendants have operated treatment centers under the names "Redding Cancer Treatment Center,"

10   "Solace Cancer Care," "Santa Cruz Radiation Oncology," "Cabrillo Radiation Oncology Center,"

11   "Coastal Radiation Oncology Center," "Mission Hope Cancer Center," "North Oaks Radiation

12   Oncology Center," and numerous others that do not directly use the name 21st Century Oncology.

13        16.    Through their treatment centers, Defendants routinely collect and/or generate

14   protected personal medical about their patients. This information includes, but is not limited to,

15   patient names, Social Security numbers, physician's names, diagnoses and treatment information,

16   and insurance information.

17        17.    The treatment centers provide 21st Century Oncology with access to at least some,

18   if not all, of the personal and medical information that they collect. Such information is or was

19   maintained, among other places, in a 21st Century Oncology network server. As explained by 21st

20   Century Oncology in its form 10-K for the fiscal year ended December 31, 2014 filed with the

21   United States Securities and Exchange Commission ("SEC") on March 27, 2015:

22      **Management Information Systems**
      We utilize centralized management information systems to closely monitor
23      each treatment center's operations and financial performance. Our systems
      track patient data, physician productivity, coding, and billing. The systems
24      allow us to perform budget analyses, historical financial comparisons, and
      treatment center benchmarking, enabling management to actively evaluate
25      performance. We have also developed a proprietary image and text retrieval
      system, which facilitates the storage and review of patient medical charts and
26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF                - 3 -

1    films. We periodically review our management information systems for
     possible refinements.[1]

2    18.    21st Century Oncology's 10-K further states, as a risk factor to be considered by

3    potential investors, that its Management Information Systems, which include patient personal and

4    medical information, are vulnerable to "break-ins." Specifically, the Form 10-K states: [e]ven

5    though we have implemented network security measures, our servers are vulnerable to computer

6    viruses, break-ins and similar disruptions from unauthorized tampering."[2]

7    **21st Century Oncology's October 2015 Data Breach**

8    19.    In March 2016, 21st Century Oncology publicly disclosed that it had suffered the

9    type of network break-in that it warned it was at risk for in its Form 10-K.

10   20.    In a data breach notification letter ("notification") sent to current and former

11   patients and submitted to the California State Attorney General Office, 21st Century Oncology

12   explained the following:

13       On November 13, 2015, the Federal Bureau of Investigation (FBI) advised us
         that patient information was illegally obtained by an unauthorized third party
14       who may have gained access to a 21st Century database. We immediately
         hired a leading forensics firm to support our investigation, assess our systems
15       and bolster security. The forensics firm determined that, on October 3, 2015,
         the intruder may have accessed the database, which contained information that
16       may have included your name, Social Security number, physician's name,
         diagnosis and treatment information, and insurance information. We have no
17       evidence that your medical record was accessed.[3]

18   21.    The notification further stated that 21st Century Oncology is continuing to work

19   closely with the FBI on the investigation into the intrusion into its system and that "[i]n addition to

20   security measures already in place, [21st Century Oncology] ha[s] also taken steps to enhance

21   internal security protocols to help prevent a similar incident in the future."

22   22.    Each notification was sent under the name 21st Century Oncology and did not

23

24   [1] See 21st Century Oncology Holdings, Inc. Form 10-K for fiscal year ended December 31, 2014 at
     p. 9, available at https://www.21co.com/investors/sec-filings (last visited April 18, 2016).
25   [2] Id. at p. 45.
     [3] See data breach notification attached hereto as Exhibit A, also available on the State of California
26   Department    of    Justice,    Office    of    the    Attorney    General's    website    at
     https://oag.ca.gov/ecrime/databreach/reports/sb24-60307 (last visited April 18, 2016).
27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF                                            - 4 -

1    identify the names of the specific treatment centers from which the information was gathered.

2        23.    The notifications also downplayed the risk associated with the data breach stating

3    "we have no evidence that your medical record was accessed" and that "[w]e have no indication

4    your information has been misused in any way." Notably absent from the notifications, however,

5    was any clear explanation as to why affected patients should feel confident that their personal and

6    medical information involved in the breach will not be misused at some later point in time.

7        24.    Additionally, out of what it claims was "an abundance of caution, the notifications

8    offered affected patients one year of free membership in Experian's ProtectMyID Alert. Based on

9    information and belief, it did not offer any patients any other remedy, monetary or otherwise.

10        25.    The notifications were not the only place 21st Century Oncology discussed the data

11    breach. In a separate Form 8-K SEC filing dated March 4, 2016, 21st Century Oncology stated

12    that it would be notifying 2.2 million current and former patients about the breach and that certain

13    pieces of their information may have been "copied and transferred" into the possession of the

14    unauthorized third party.[4]  Explicit reference to such copy and transfer was omitted from the

15    patient notifications.

16        26.    The notifications and SEC filing both appear to be intentionally vague about the

17    details of the data breach. However, 21st Century's comprehensive data breach notification

18    process is telling about the scope of the breach.

19        27.    On or around the same date as its SEC filing, 21st Century Oncology notified the

20    United States Department of Health and Human Services about the data breach. Such notice is

21    required under the Federal HITECH Act, which is part of the Health Insurance Portability and

22    Accountability Act ("HIPAA"), only when unencrypted protected health information has been, or

23    is reasonably believed to have been, accessed, acquired, or disclosed as a result of a breach.[5]

24        28.    On or around the same date as its SEC filing, 21st Century Oncology also notified

25    _____
      [4]  See 21st Century Oncology Holdings, Inc. Form 8-K, dated March 4, 2016 available at
26    https://www.21co.com/investors/sec-filings (last visited April 18, 2016) and attached hereto as
      Exhibit B.
27    [5]  Public Law 111-5, Section 13402.

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF                                    - 5 -

1  the California State Attorney General's Office about the data breach. Such notice is required only

2  when a covered business knows, or reasonably believes that, the unencrypted personal information

3  of more than 500 California residents has been acquired by an unauthorized person.[6]

4        29.     21st Century Oncology also notified 2.2 million current and former patients,

5  including at least 500 current or former patients in the state of California, about the data breach.

6  Such notices are again only required under California state and Federal law when would the

7  notifying party knows, or at the very least reasonably believed, that information relating to the

8  notified patients had been, accessed, acquired, or disclosed as a result of a breach.[7]

9        30.     Finally, 21st Century Oncology offered to provide each of the 2.2 million patients

10  with its patients with Experian's ProtectMyID credit monitoring services.[8]  Such services are not

11  without expense to 21st Century Oncology.  Indeed, such services currently retail for $4.95 for the

12  first month, and then $19.95 for each month thereafter.  The provision of such services plainly

13  reflects that 21st Century Oncology believes patients are at risk of their information being misused.

14  **21st Century Oncology Had a Duty to Protect Patients' Personal and Medical Information**

15        31.     Healthcare providers like 21st Century Oncology have a duty to protect the

16  confidentiality of patients' personal and medical information.  California's Confidentiality of

17  Medical Information Act, California Civil Code § 56, subsection 56.101. requires that:

18        (a) Every provider of health care, health care service plan, pharmaceutical
         company, or contractor who creates, maintains, preserves, stores, abandons,
19        destroys, or disposes of medical information shall do so in a manner that
         preserves the confidentiality of the information contained therein. Any
20        provider of health care, health care service plan, pharmaceutical company, or
         contractor who negligently creates, maintains, preserves, stores, abandons,
21        destroys, or disposes of medical information shall be subject to the remedies
         and penalties provided under subdivisions (b) and (c) of Section 56.36. (b) (1).
22        An electronic health record system or electronic medical record system shall
         do the following; (A) Protect and preserve the integrity of electronic medical
23        information. (B) Automatically record and preserve any change or deletion of
         any electronically stored medical information. The record of any change or
24

25

26  [6] Cal. Civ. Code § 1798.82(a).
27  [7] Public Law 111-5, Section 13402, Cal. Civ. Code § 1798.82(a).
   [8] *See* Exhibit B.
28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF                                    - 6 -

1    deletion shall include the identity of the person who accessed and changed the
     medical information, the date and time the medical information was accessed,
2    and the change that was made to the medical information.

3        32.    HIPAA also specifies technical safeguards for storing personal and medical

4    information which include, among other things, requiring information access controls, encryption

5    and decryption mechanisms for medical information or equivalent alternative measures, audit

6    controls that record and examine activity in information systems storing medical information, and

7    methods to authenticate or verify that a person seeking access to protected health information is the

8    one claimed.[9]

9        33.    21st Century Oncology is well aware of these duties.  In its notice of privacy

10   practices provided on its website, it states:

11       **Our Responsibilities**

12       We are required by law to maintain the privacy of your protected health
         information, to provide you with notice of our legal duties and privacy
13       practices with respect to that protected health information, and to notify any
         affected individuals following a breach of any unsecured protected health
14       information. We will abide by the terms of the notice currently in effect.[10]

15       34.    By failing to properly secure its network and allowing an authorized third party to

16   access and acquire current and former patient's personal and medical information, 21st Century

17   Oncology failed to live up to its duty of protecting such information.

18   <u>Healthcare Providers Face a Known Risk of Personal and Medical Information Theft.</u>

19       35.    Medical information in particular can be extremely lucrative on black markets.  For

20   example, the online publication www.esecurityplanet.com quotes one information security

21   professional, Kunal Rupani, director of product management at Accellion, as stating that:

22       "Unlike credit card numbers and other financial data, healthcare information
         doesn't have an expiration date[.]" [] "As a result, a patient's records can sell
23       on the black market for upwards of fifty times the amount of their credit card
         number, making hospitals and other healthcare organizations extremely
24

25

26   ---
     [9] 45 CFR 164.312.
     [10] 21st Century Oncology Notice of Privacy Practices dated March 26, 2013; available at
27   www.21co.com/company/hipaa-notice-of-privacy-practices (last visited April 18, 2016).

28   COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF                                          - 7 -

lucrative targets for cybercriminals."[11]

36.    Similarly, Kevin Watson, CEO of the cyber-security firm Netsurion, reportedly explained the additional value of PHI as follows:

"It appears that diagnosis and treatment information might have been exposed, which could unlock the potential for significant medical fraud. And if insurance plan information was stolen along with identity information, data thieves would have a good indicator on which identities hold a higher value, based on the value of the insurance plan[.]" [] ...

"If thieves focus on the individuals with the highest plan costs, these are likely to be people who are more established in their lives, have families, higher incomes and better credit, meaning their identities are worth even more on the black market[.]"[12]

37.    Despite the additional value of medical information on the black market, and the duty imposed on healthcare providers to maintain the confidentiality of medical information, healthcare providers have lagged behind other industry sectors in protecting confidential information.

38.    In April 2014, the FBI issued a private industry notice to the healthcare sector stating that it was vulnerable to cybercrime and not living up to the standards necessary to protect the confidentiality of the personal and medical information in its possession.   The warning explained: "The healthcare industry is not as resilient to cyber intrusions compared to the financial and retail sectors, therefore the possibility of increased cyber intrusions is likely."[13]  According a Reuters' article, the notice cited a February 2014 report from the non-profit SANS Institute, which trains cybersecurity professionals. "SANS had warned the healthcare industry was not well-prepared to fight growing cyber threats, pointing to hundreds of attacks on radiology imaging

---

[11] See http://www.esecurityplanet.com/network-security/21st-century-oncology-notifies-2.2-million-patients-of-data-breach.html (last visited April 14, 2016).
[12] See Hospital Leaks 2.2M Cancer Patient Records, Because Their Life Wasn't Bad Enough, Catalin Cimpanu, Softpedia, March 9, 2016, available online at http://news.softpedia.com/news/hospital-leaks-2-2m-cancer-patient-records-because-their-life-wasn-t-bad-enough-501549.shtml (last visited April 14, 2016).
[13] See Jim Finkle, Exclusive: FBI warns healthcare sector vulnerable to cyber attacks, Reuters, April 23, 2014, available online at http://www.reuters.com/article/us-cybersecurity-healthcare-fbi-exclusiv-idUSBREA3M1Q920140423 (last visited April 18, 2016).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF                                    - 8 -

1  software, video conferencing equipment, routers and firewalls."[14]

2  **21st Century Oncology Has Learned of Two Data Breaches From Federal Authorities**

3      39.    As if to prove the point of the FBI's warning that healthcare providers are not

4  adequately equipped to protect the personal and medical information in their possession, 21st

5  Century Oncology has now twice learned about data breaches involving its records from federal

6  law enforcement officials.

7      40.    In 2013, 21st Century Oncology of Maryland notified Maryland's Office of the

8  Attorney General that it had learned from federal law enforcement officials that a former employee

9  of 21st Century Oncology had improperly accessed the personal health information of several

10  patients.[15] The information was shared with a third party who then used the information, or

11  intended to use the information, to file fraudulent tax returns with the Internal Revenue Service.

12      41.    At the time 21st Century Oncology notified the Maryland Attorney General of the

13  data breach, it had not yet completed its "own internal investigation to determine how the

14  employee was able to improperly access the patients' personal information." 21st Century

15  Oncology also could not pinpoint the date and time of the data breach, stating it believed the data

16  was "improperly accessed between October 11, 2011 and August 8, 2012." This belief was

17  apparently based on the government's felony indictment of the former employee, not on any

18  systems 21st Century Oncology had in place to identify the sources or causes of data breaches. As

19  a result of the data breach, 21st Century Oncology promised to review its security procedures and

20  take appropriate corrective actions.

21      42.    Now, as stated in its March 2016 notifications, 21st Century Oncology has again

22  learned of a breach of the confidentiality of the personal and medical information in its possession

23  from the FBI.

24

25  [14] *Id.*

26  [15] 21st Century Oncology of Maryland Security Breach Notification dated July 10, 2013, attached hereto has **Exhibit C** and available on the internet at https://www.oag.state.md.us/idtheft/Breach%20Notices/2013/itu-230673.pdf (last visited April 18,

27  2016).

28

    COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF        - 9 -

43. As with the 2013 data breach, 21st Century Oncology was apparently oblivious of the data breach until it learned of the breach from the FBI. Like the 2013 data breach, 21st Century Oncology has also been unable to determine, on its own, how and when the data breach occurred. Even after hiring what it calls "a leading forensics firm" to support its investigation, its notifications only identify a date on which the database containing personal and medical information *may* have been accessed by the unauthorized third party.

44. The two data breaches, and 21st Century Oncology's responses to the two data breaches, show that 21st Century Oncology has not had systems in place to adequately monitor and protect against unauthorized access to patient information. 21st Century Oncology failed to properly encrypt the personal and medical information in its possession for electronic storage, as would have been reasonable and appropriate in light of its known and admitted risk of cyber intrusions, ensuring only authorized access and usage to the information. 21st Century Oncology's security systems also apparently lack sufficient user identification and audit controls, leaving 21st Century Oncology unable to identify the who what, when, where, and how of unauthorized access to patient information. Such failures on the part of 21st Century Oncology constituted negligence and were not in compliance with the technical requirements of HIPAA or the medical information storage requirements of the Confidentiality of Medical Information Act.

45. As more broadly explained by Chenxi Wang, Chief Strategy Officer of Twistlock, a cyber security firm, to the online publication esecurityplanet.com: "The fact that many of these breaches are reported by the FBI, rather than discovered by the company that holds the data, speaks to the heart of the problem -- many organizations do not have sufficient technical expertise and capabilities in place to protect data and respond in a timely manner in the event of a breach," Wang added. "This is becoming an increasingly pressing problem for the entire industry."[16]

---

[16] *21st Century Oncology Notifies 2.2 Million Patients of Data Breach*, Jeff Goldman, eSecurity Planet, March 11, 2016, available at http://www.esecurityplanet.com/network-security/21st-century-oncology-notifies-2.2-million-patients-of-data-breach.html (last visited April 18, 2016).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF                                    - 10 -

**21st Century Oncology Has Offered an Insufficient Remedy**

46.    The only remedy 21st Century Oncology has offered affected patients is one year of free identity theft protection services.  However, the services are insufficient to remedy the data breach, in light of the nature of the information that was acquired by the intruder(s).

47.    The Experian ProtectMyID service is a credit monitoring service may allow affected individuals to react and respond to attacks on their credit over the next year, after they have already occurred.  However, the Experian ProtectMyID service does not adequately monitor or protect against medical identity theft.  Indeed, 21st Century Oncology's notifications admit as much, telling affected patients "[w]e also recommend that you regularly review the explanation of benefits that you receive from your health insurer. If you see services that you did not receive, please contact your insurer immediately."[17]

48.    According to Experian's website, "healthcare data breach is one of the many crimes that facilitate medical identity theft."[18]

49.    Medical identity theft can have serious consequences.  According to the Federal Trade Commission ("FTC"), it can result in bills for medical services that consumers never received; calls from debt collectors and medical collection notices for bills consumers do not owe; exhaustion of health insurance benefits based on services provided not to the insured but the medical identity thief; or denial of, or increased cost for, insurance based on medical records showing conditions the consumer does not actually have.[19]

50.    The Experian ProtectMyID website admits that the service, alone, is not adequate to protect against medical identity theft.  In a blog post discussing the "rising threat" of medical identity theft, the service explains:

"The consequences of financial identity theft are bad enough," asserts Experian's ProtectMyID, "but medical identity theft carries the extra danger

---

[17] See Exhibit A.
[18]    See http://www.experian.com/data-breach/newsletters/best-practices-for-resolving-medical-identity-theft.html (last visited April 14, 2016)
[19] See Federal Trade Commission, Consumer Information on Medical Identity Theft, available at https://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited April 18, 2016).

that errors in your medical file could lead to a misdiagnosis or mistreatment when you seek medical care in the future. Even if changes to an individual's medical records are not a deliberate part of the thief's scam, they may nonetheless be the result."

With healthcare coverage comes a flurry of documentation that explains coverage, charges and benefits. The good news is that, while the amount of information can sometimes feel excessive, it provides a solid framework to check for fraudulent or suspicious entries. But occasionally it's not enough simply to scan over your medical information alone. One of the most effective and proactive ways to combat medical fraud is to also monitor your credit report closely in tandem with your medical records review.[20]

51.     Additionally, resolving medical identity theft can be very time consuming and difficult. The affected individual may need to obtain a full copy of their medical record, at their own expense, by contacting each doctor, clinic, hospital, pharmacy, laboratory or other healthcare provider that may have information about them or that may have been used by the medical identity thief and then review the entire record for errors; the affected individual will also need to review all insurance explanations of benefits for errors; the affected individual will then write to the health plan and medical providers explaining what information is inaccurate along with supporting evidence of why the information is inaccurate and hope that the health plan or provider agrees with their explanation.[21] They may also need to change insurance identification numbers so that their insurance can no longer be used by the identity thief.  It may take years for an individual to discover that their medical record has been affected and it may take years for the records to get corrected.[22]

52.     Accordingly, individuals affected by this data breach have been harmed and will continue to be harmed by the data breach, regardless of whether they take advantage of the single year of identity protection services that have been offered to them by 21st Century Oncology:

[20] See Medical Fraud: Dangerous or Benign, ProtectMyID Blog, October 21, 2015, available at http://blog.protectmyid.com/2015/10/21/medical-fraud-dangerous-or-benign/ (last visited April 18, 2016).
[21] See Federal Trade Commission, Consumer Information on Medical Identity Theft, available at https://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited April 18, 2016).
[22] See Herb Weisbaum, Medical identity theft could cost you your life, www.today.com, Sept. 12, 2013, available online at http://www.today.com/money/medical-identity-theft-could-cost-you-your-life-8C11133476 (last visited April 18, 2016).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF                                          -12-